**Bonnie RADAKOVICH, Appellant,**

v.

**Richard L. RADAKOVICH, Appellee.**

v.

**Scott R. Radakovich, Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 18, 2003.

Filed March 25, 2004.

Kevin P. Leonard, Latrobe, for appellant.

Thomas Rivosecchi, Indiana, for Scott Radakovich, appellee.

BEFORE: STEVENS, ORIE MELVIN, and CAVANAUGH, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the March 12, 2003 order entered in the Court of Common Pleas of Indiana County declaring Appellee Scott R. Radakovich ("Son") to

be the owner of a PNC brokerage account and remanding certain equitable distribution claims relating to Appellee Richard L. Radakovich ("Husband") and Appellant Bonnie Radakovich ("Wife") to a master for resolution. On appeal, Wife alleges that (1) the trial court should have denied Son's petition to intervene since the issues raised therein were previously litigated and barred by *res judicata*, collateral *estoppel*, and laches, (2) the trial court erred in reversing its May 8, 2000 order wherein the court determined that the PNC brokerage account was marital property belonging to Husband and Wife, and (3) the trial court applied the incorrect law in determining ownership of the PNC brokerage account. We affirm.

¶ 2 The relevant facts and procedural history are as follows: On December 5, 1997, Wife filed a complaint in divorce averring that Husband and Wife were married on November 23, 1974, and have one child, Son, who was then seventeen years old. Wife sought custody of Son, equitable distribution, spousal support and/or alimony, and possession of the marital residence. On January 29, 1999, a master was appointed to resolve the divorce and economic claims, and Wife listed in her income/expense statement a PNC brokerage account number 57840375 as an asset belonging to Husband/Son.

¶ 3 On May 25, 1999, a hearing was held before the master, and on July 19, 1999, the master filed a report. In the report, the master stated the following regarding the PNC brokerage account at issue: [1]

Testimony revealed that this account contained approximately $113,000 and according to [Husband] was formed for the purpose of financing the parties'

1. We note that the master indicates that the brokerage account number is 27840375. This is an apparent typographical error.

[son's] post secondary education. [Wife] testified that she did not know whose names were originally placed on the account which is titled in the joint names of [Husband] and Son, but that she believed [Wife] and [Husband] were joint owners.

The master finds her testimony not believable because she and [Husband] were sitting at the same desk, executed the documents at the same time, and it is believed that she knew the form of ownership. Yet, now [Wife] wants the Master to believe that she did not.

The Master recommends that this account be turned over to [Son] upon his reaching the age of majority.

Master's Report filed 7/19/99 at 9–10. The master then recommended that the PNC brokerage account number 57840375 be placed in trust for Son, to be given to him when he reaches the age of majority.

¶ 4 On July 23, 1999, Husband filed exceptions to the master's report wherein he alleged, *inter alia,* that the master failed to make a recommendation regarding equitable distribution and erred in directing that the PNC brokerage account be placed in trust for Son. Husband alleged that the evidence revealed that the account was needed to pay for Son's college tuition and that Husband was unclear as to whether the account could be used for its intended purpose. On July 29, 1999, Wife filed exceptions to the master's report wherein she alleged, *inter alia,* that the master erred in ordering the PNC brokerage account be placed in trust and released to Son when he reached the age of majority, and the master erred in failing to make a recommendation concerning equitable distribution. Wife asserted that the account

consisted solely of contributions made from marital funds, the account represented a substantial portion of the marital estate, and she never intended that the entire account would be used for Son's educational purposes.

¶ 5 On August 5, 1999, Wife filed a petition for special relief requesting that the trial court prevent Husband or Son from removing funds from the PNC brokerage account, and on September 20, 1999, the trial court filed an order enjoining Husband or Son from removing funds from the account. On November 4, 1999, the trial court filed an order remanding the parties' equitable distribution issues to the master for further resolution. Specifically, the trial court directed the master to, *inter alia,* make specific findings as to the value of the marital assets, recommendations as to the equitable distribution of the property, and specific findings as to the nature of the brokerage account set aside for Son's education. On March 29, 2000, with regard to their exceptions, the parties filed a stipulation as to the value of certain assets and the issues to be decided. Among the issues to be decided was whether the PNC brokerage account was marital property subject to equitable distribution.

¶ 6 Subsequently, on May 8, 2000, the trial court filed an opinion and order denying in part and granting in part the parties' exceptions to the master's report.[2] With regard to the PNC brokerage account at issue, the trial court concluded that the account contained $113,825.00 and that the account was primarily established for Son's education. However, the trial court further concluded that Son's education would cost $48,000.00 only, and that

2. In an opinion filed on March 12, 2003, the trial court indicated the master made supplemental findings after the trial court remanded the matter to the master on November 4,

1999, and the parties filed new exceptions. Neither the certified record nor the docket entries contain any supplemental findings or exceptions.

the remaining $65,825.00 was marital property subject to equitable distribution.

¶ 7 On May 16, 2000, Husband filed a motion for reconsideration of the trial court's order contending, *inter alia,* that the court erred in concluding that a portion of the brokerage account was marital property. The trial court denied the motion for reconsideration on May 25, 2000. Husband filed a notice of appeal to this Court from the May 8, 2000 order, and on September 1, 2000, this Court quashed the appeal since it was taken from an order of equitable distribution entered prior to the entry of a final divorce decree.

¶ 8 On November 30, 2001, Son filed a petition to intervene pursuant to Pa.R.C.P. 2328 alleging that Son is twenty-one years old, he is an indispensable party to the matter, and he is entitled to the entire PNC brokerage account. By order filed March 1, 2002, the trial court granted Son leave to intervene, and Wife filed a response to Son's petition to intervene. On July 15, 2002, at the beginning of the hearing regarding the ownership of the PNC brokerage account, the trial court verbally stated the following order, to which the parties specifically agreed:

> AND NOW, July 15, 2002, prior to the taking of testimony in the matter now before this Court, the following order is entered: One, motion by [Son], intervener, to reconsider this Court's order of May 8, 2000 and reopen the record solely as to the issue of the presence or absence of an UGMA account is granted. Paragraph two, by agreement, all parties shall be bound by the opinion and order of this Court which will be entered following the reopening of this rec-

ord...subject to appellate review as provided by law.

N.T. 7/15/02 at 4–5.

¶ 9 Following testimony taken on July 15, 2002, and October 7, 2002, by order and opinion filed on March 12, 2003, the trial court concluded that Son was not barred from asserting his claim as an intervener, and that the PNC brokerage account number 7784–0037 [3] was Son's property under the Pennsylvania Uniform Transfers to Minors Act (PUTMA), 20 Pa.C.S.A. § 5301–5310. In so ruling, the trial court stated, "[t]he parties must carefully note the limited scope of this Court's ruling. The Court holds [Son] is the owner of the account under the UTMA. The Court is not ruling on whether any of the account may be treated as marital property for purposes of ongoing litigation between [Husband and Wife]." Trial Court Opinion filed 3/12/03 at 10. The trial court also specifically stated that:

> This Order is meant as a final order with respect to [Son's] ownership of the account. Because that ownership is so tightly intertwined with pending equitable distribution, should any party take an appeal from that portion of the Court's order, the Court would look favorably upon the application for stay of equitable distribution pending resolution of the appeal.

Trial Court Opinion filed 3/12/03 at 13.

¶ 10 On April 3, 2003, Wife filed an appeal to this Court from the trial court's March 12, 2003 order, the trial court ordered Wife to file a statement pursuant to Pa.R.A.P. 1925(b), and Wife filed the requested statement in a timely manner. No further opinion was filed by the trial court.[4]

---

3. At some point, the bank renumbered the brokerage account.

4. We note that the trial court failed to file a Pa.R.A.P. 1925(a) opinion in response to Wife's court-ordered Pa.R.A.P. 1925(b) statement. Generally, such a failure would re-

¶ 11 Before addressing the issues raised on appeal, we must decide whether this appeal is properly before us. "Under Pennsylvania law, an appeal may only be taken from an interlocutory order as of right (Pa.R.A.P. 311), from a final order (Pa.R.A.P. 341), from a collateral order (Pa.R.A.P. 313), or from an interlocutory order by permission (Pa.R.A.P. 31[2], 1311, 42 Pa.C.S.A. § 702(b))" *Nemirovsky v. Nemirovsky,* 776 A.2d 988, 991 (Pa.Super.2001) (quotation marks and quotations omitted).

¶ 12 This appeal is not taken from an interlocutory order as of right. *See* Pa. R.A.P. 311. Nor has Wife sought permission to appeal from an interlocutory order. As to whether the order is a final order, Pa.R.A.P. 341 provides that a final order disposes of all parties and all claims.[5] Here, there is no doubt that the trial court's March 12, 2003 order did not dispose of all parties and all claims. This Court has held that "where a decree in divorce has not been entered and ancillary claims remain unresolved, issues such as those seeking special relief, are interlocutory and unappealable." *Mensch v. Mensch,* 713 A.2d 690, 691 (citations omitted). *See Wilson v. Wilson,* 828 A.2d 376 (Pa.Super.2003) (holding that pre-divorce order of equitable distribution is not a final order). No divorce decree has been entered in this case, and the equitable distribution issues remain outstanding. Moreover, our conclusion the order is not final under Pa.R.A.P. 341 is further supported by the fact the trial court specifically remanded issues to the master for further consideration.

¶ 13 This leaves us to determine whether the order can be characterized as a collateral order under Pa.R.A.P. 313.

Section (b) of Rule 313 defines a collateral order as an order (1) separable from and collateral to the main cause of action where (2) the right involved is too important to be denied review and (3) the question presented is such that if review is postponed until final judgment in the case the claim will be irreparably lost. To benefit from the collateral order doctrine, an order must satisfy all three elements.

*Nemirovsky,* 776 A.2d at 991 (citation omitted). *See McMahon v. McMahon,* 706 A.2d 350 (Pa.Super.1998).

■ ¶ 14 In this case, that part of the order declaring Son, as opposed to Husband and Wife, the owner of the PNC brokerage account is separate from and collateral to the parties' underlying divorce action and equitable distribution of property. *See Nemirovsky, supra* (holding that order denying company right to claim ownership of equipment in a divorce action was a collateral order); *McMahon, supra* (holding that order directing the wife to sign a sales agreement for a piece of property owned by the husband and wife was collateral to the underlying divorce action). Moreover, we conclude the right involved is important. The order declares that Son is the owner of an account containing $113,825.00. *See Nemirovsky, supra* (holding that determining ownership of property is an important right not to be denied review). Further, any rights Wife may have as to the account will be irrepa-

---

quire this Court to remand the matter to the trial court for the drafting of an opinion. However, in its March 12, 2003 opinion, the trial court thoroughly analyzed the issues Wife has preserved for our review. Therefore, it would be futile to remand for the preparation of an additional opinion.

**5.** The trial court did not make "an express determination that an immediate appeal would facilitate resolution of the entire case," as is contemplated by Pa.R.A.P. 341(c).

rably lost if review is postponed until a final divorce decree is entered since Son could dissipate the funds in their entirety. Therefore, we conclude the order declaring Son to be the owner of the PNC brokerage account is appealable as a collateral order.

■ ¶ 15 Turning to the merits of the appeal, Wife first claims the trial court erred in granting Son's petition to intervene in this matter. Specifically, Wife contends Son's petition was barred by the doctrines of *res judicata*, collateral *estoppel*, and laches.[6]

Pursuant to the doctrine of *res judicata*, a final judgment on the merits by a court of competent jurisdiction will bar any future suit between the parties or their privies in connection with the same cause of action. The purposes behind the doctrine, which bars the re-litigation of issues that either were raised or could have been raised in the prior proceeding, are to conserve limited judicial resources, establish certainty and respect for court judgments, and protect the party relying upon the judgment from vexatious judgment. In keeping with these purposes, the doctrine must be liberally construed and applied without technical restriction. Furthermore, we note that the application of *res judicata* requires the concurrence of four conditions between the present and prior actions: (1) identity of issues; (2) identity of causes of action; (3) identity of parties or their privies; and (4) identity of the quality or capacity of the parties suing or being sued.

*Yamulla Trucking & Excavating Co. v. Justofin*, 771 A.2d 782, 784 (Pa.Super.2001) (citations omitted). *See Glynn v. Glynn*, 789 A.2d 242 (Pa.Super.2001) (*en banc*).

■ ¶ 16 In the case *sub judice*, the trial court determined that the doctrine of *res judicata* did not apply because there was no identity of parties. Specifically, the trial court concluded that Son was not a party to the matter when Husband and Wife originally litigated their equitable distribution issues before the master and their exceptions to the master's report. As such, Son did not have an opportunity to appear before the master or the trial court before the court entered its May 8, 2000 order, in which the court concluded that Son was entitled to only a portion of the PNC brokerage account. We agree with the trial court and conclude that *res judicata* did not preclude Son's action or the trial court's March 12, 2003 order.

■ ¶ 17 Collateral *estoppel*, which is closely related to *res judicata*, bars the relitigation of issues where:

(1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and (5) the determination in the prior proceeding was essential to the judgment.

*Justofin*, 771 A.2d at 786 (citations omitted).

■ ¶ 18 As with the doctrine of *res judicata*, the trial court concluded that Son's action was not barred under collateral *estoppel* since Son was not a party to the matter when the trial court originally concluded that Son was entitled to only a portion of the PNC brokerage account. We agree and find that collateral *estoppel* is not applicable.[7]

---

6. Wife specifically raised these defenses in response to Son's petition to intervene.

7. With regard to *res judicata* and collateral *estoppel*, Wife contends that Son was a party

¶ 19 With regard to the doctrine of laches, the Supreme Court has stated:

> The doctrine of laches bars relief when the plaintiff's dereliction indicates a lack of due diligence in failing to institute an action and such failure results in prejudice to another. The party asserting laches as a defense must present evidence demonstrating prejudice from the lapse of time. Such evidence may include establishing that a witness has died or become unavailable, that substantiating records were lost or destroyed, or that the defendant has changed his position in anticipation that the opposing party has waived his claims.

*Commonwealth ex rel. Baldwin v. Richard,* 561 Pa. 489, 496, 751 A.2d 647, 651 (2000) (citations omitted). *See Estate of Bowman,* 797 A.2d 973, 977 (Pa.Super.2002) ("The doctrine of laches is applicable when two conditions are satisfied: [t]he complaining party must be guilty of a want of due diligence in failing to assert his rights and the failure must have worked to the prejudice of the party seeking its application." (quotation marks and quotation omitted)).

■ ¶ 20 The trial court concluded that Wife failed to produce evidence demonstrating that she was prejudiced by Son's delay in filing his petition to intervene. We agree. In her appellate brief, Wife avers that she was prejudiced because the trial court's granting of Son's petition to intervene gave Husband an opportunity to relitigate the issue of ownership of the PNC brokerage account. However, we conclude that the trial court's order gave Son, who did not previously have an opportunity, the ability to assert his ownership claims. Moreover, we find no merit to Wife's claim that it was unjust for the trial court to permit Son to intervene because, the only reason Son was able to intervene, was because the trial court inadvertently failed to enter a final divorce decree after the master recommended such. Wife cites no authority for her assertion that "[i]f the divorce had been granted, then there is no question that the petition to intervene could not have been brought." Wife's Brief at 16. Even if the court had entered a divorce decree, it is clear that the parties' equitable distribution issues, including distribution of the PNC brokerage account, remained outstanding at the time Son filed his petition to intervene. As such, we find this argument to be meritless.

¶ 21 Wife's next claim is that the trial court failed to provide an adequate basis for its March 12, 2003 opinion and order, which reversed the trial court's May 8, 2000 order. Wife specifically claims that Son did not testify at the July 15, 2002 or October 7, 2002 hearings, which were held in response to Son's petition to intervene, and that Husband and Wife testified substantially similar as they did at the master's hearing. We find this issue to be waived.

when the trial court's May 8, 2000 order was entered since Son sat in the back of the courtroom during some of the divorce proceedings. Wife's Brief at 13. We find this argument to be unavailing. *Res judicata* and collateral *estoppel* require more than mere presence in a courtroom. Moreover, Wife suggests that *res judicata* and collateral *estoppel* apply because Husband, who was a party when the May 8, 2000 order was entered, was the custodian of the PNC brokerage account and could have

hired an attorney at any time on behalf of Son. The record is clear that there exists a conflict of interest between Husband and Son as it relates to ownership of the account and Husband was not named as a party in his representative capacity. As such, we disagree that Husband's position as custodian of the PNC brokerage account requires the finding that Son was a party or in privity with a party when the May 8, 2000 order was entered.

¶ 22 Wife has cited no authority for or provided this Court with any legal discussion regarding her assertion that the trial court was prohibited from reversing its previous decision after Son filed a petition to intervene or that such reversal could occur only if Son testified at the hearings. *Eichman v. McKeon*, 824 A.2d 305 (Pa.Super.2003); Pa.R.A.P. 2119. Moreover, to the extent Wife's claim is intended to include a sufficiency of the evidence claim, we conclude the claim has not been properly developed. While Wife summarized portions of the testimony offered at the July 15, 2002 and October 7, 2002 hearings, Wife has neither cited authority nor presented legal discussion supporting her position. *Eichman, supra*; Pa.R.A.P. 2119. We remind Wife that it is not this Court's function or duty to become an advocate for an appellant. *Eichman, supra*. As such, Wife's claim has been waived.

¶ 23 Wife's final contention is that the trial court erred in concluding the PNC brokerage account was subject to the Pennsylvania Uniform Transfers to Minors Act (PUTMA), 20 Pa.C.S.A. § 5301–5310. Wife contends that ownership of the account should have been analyzed under 23 Pa.C.S.A. §§ 3501 and 3323 of the Pennsylvania Divorce Code since Son failed to prove that the brokerage account was an *inter vivos* gift made to him by Husband and Wife. Wife specifically alleges that she had no intent to gift the entire brokerage account to Son.

¶ 24 In determining that PUTMA was applicable in this case, the trial court stated the following:

> The transfer here meets the requirements of the [P]UTMA. The documents plainly indicate an intent to create a[P]UTMA account and otherwise meet the statutory requirements for [P]UTMA creation. Section 5703(a). The transfer was made only for one minor, and only one person was the custodian. Section 5310. As a result, the transfer is irrevocable, and the custodial property is indefeasibly vested in the minor. Section 5311(b) and 5307(a).

Trial Court Opinion filed 3/13/03 at 9. We find no abuse of discretion in this regard.

When the language of a statute is clear and unambiguous, it is not to be disregarded under the pretext of pursuing the spirit of the statute. Only when the language of the statute is ambiguous does statutory construction become necessary.

The purpose of PUTMA is to provide an inexpensive, easy way for giving property to minors. Section 5304 of PUTMA addresses the irrevocable nature of transfers to PUTMA accounts and provides:

> A person may make a transfer by irrevocable gift to, or the irrevocable exercise of a power of appointment in favor of, a custodian for the benefit of a minor pursuant to Section 5309 (relating to manner of creating custodial property and effecting transfer).

20 Pa.C.S.A. § 5304. Whatever its source, custodial property that is held pursuant to Section 5304 is the property of the minor child.

Section 5309, which addresses the manner of creating custodial property and effecting transfer, provides in relevant part:

> (a)Creation of custodial property.— Custodial property is created and a transfer is made whenever:
>
> . . .
>
> (2) Money is paid or delivered to a broker or financial institution for credit to an account in the name of the transferor, an adult other than the transferor or a trust company, fol-

lowed in substance by the words: 'as custodian for (name of minor) under the Pennsylvania Uniform Transfers to Minors Act.'

20 Pa.C.S.A. § 5309. The plain meaning of Section 5309(a)(2) indicates that a transfer is made and 'custodial property' is created when money is deposited into a brokerage account in the name of the parent as custodian for the minor under PUTMA.

. . .

The plain meaning of Section 5311(b) [of PUTMA] is that a transfer made into the PUTMA account of the minor is irrevocable and the vesting of the custodial property in the minor cannot be undone.

As the above reflects, the relevant PUTMA provisions are unambiguous on their face and they, therefore, must be given effect in accordance with their plain and common meaning. The plain and common meaning of the relevant provisions of PUTMA is that money transferred into a custodial brokerage account is irrevocably the property of the minor child.

*Sternlicht v. Sternlicht*, 822 A.2d 732, 737–738 (Pa.Super.2003), *appeal granted*, 575 Pa. 499, 837 A.2d 459 (2003) (citations and quotations omitted).

¶ 25 In the case *sub judice*, Ronald P. Hunter testified that he is a financial consultant at PNC Investments and that he met with Husband and Wife in April 1996. N.T. 7/15/02 at 7. Mr. Hunter testified he established a UGMA[8] account on behalf of Son, and Husband was the named custodian. N.T. 7/15/02 at 7. Mr. Hunter testified that the application indicated that the account was registered to "Richard Radakovich C/F Scott R. Radakovich, PA UGMA custodian," and that "C/F" indicated the account was a custodian account. N.T. 7/15/02 at 8. Mr. Hunter indicated that Husband and Wife were present when the application was completed, Wife did not object to the creation of the account on behalf of Son, and Wife did not object to Husband being named as the custodian. N.T. 7/15/02 at 9–10.

¶ 26 Husband testified that in April 1996 he opened a custodial account for Son under the Uniformed Gift to Minors Act, and that Wife was present when the account was opened. N.T. 7/15/02 at 5.[9] Husband testified that both he and Wife agreed to set aside money for Son's education, the funds removed from the brokerage account have been used for Son's education, and Son's education was the purpose of the brokerage account. N.T. 7/15/02 at 6–7, 13. Husband testified that he was named as the custodian of the brokerage account, and he and Wife discussed the brokerage account. N.T. 7/15/02 at 8, 12. Husband confirmed that the brokerage account was titled "Richard Radakovich, custodian for Scott Radakovich under the UGMA." N.T. 7/15/02 at 12. Husband testified that he believed he no longer owned the money when it was placed into the brokerage account. N.T. 7/15/02 at 13. Husband testified that the money deposited into the brokerage account came from the parties' joint checking account, that Wife had knowledge of the deposits, that Wife agreed with the deposits, and that Wife saw the statements. N.T. 7/15/02 at 19, 21–22, 33. Husband specifically testified that he consulted with Wife before deposits were made and that she was in full, total agreement. N.T. 7/15/02 at 40.

---

8. PUTMA is the successor legislation to the Pennsylvania Uniform Gifts to Minors Act (UGMA).

9. We note that this Court was provided with two transcripts from July 15, 2002. One of the transcripts contains Ronald P. Hunter's testimony, while the other contains Husband's testimony.

¶ 27 Wife testified that Husband handled the finances, he established bank accounts, and he determined the amount to be deposited into the accounts. N.T. 10/7/02 at 9. Wife testified that Husband did not discuss the brokerage account with her, although she was aware that it was being set up for Son's education. N.T. 10/7/02 at 10–11, 19. Wife admitted that the brokerage account was set up for Son with Husband as the custodian in a UGMA account. N.T. 10/7/02 at 16. Wife testified she did not know the ramifications of establishing a UGMA account and no one explained such to her. N.T. 10/7/02 at 16. Wife admitted that she knew Husband's role as the custodian was to oversee the account because Son was a minor. N.T. 10/7/02 at 16. Wife testified that she was not aware that she was giving money to Son as a gift when the brokerage account was established. N.T. 10/7/02 at 23. Wife admitted that she and Husband met with Mr. Hunter in April 1996, that a brokerage account was established for Son's education, and that she believed the account would give her and Husband a better return on their money. N.T. 10/7/02 at 26. Wife admitted that PNC sent statements to the house regarding the brokerage account, but she chose not to read the statements. N.T. 10/7/02 at 34. Wife admitted that she never told Husband that he could not use money from the parties' joint checking account to fund the brokerage account. N.T. 10/7/02 at 37.

¶ 28 Based on all of the aforementioned, we conclude that the trial court properly applied PUTMA in determining whether the brokerage account was the property of Son. By Wife's own admission, the account was specifically set up under PUTMA, Wife knew the account was being established on behalf of Son, and Wife knew Husband was the named custodian. The fact Wife did not know all of the ramifications of establishing an account under PUTMA and that she may not have specifically intended the account to be owned by Son does not require the conclusion PUTMA is inapplicable. *See Stern- licht, supra* (holding that lack of donative intent of the funds are of no consequence under the principles of PUTMA and ignorance of the law is no excuse). As such, we find Wife's last issue to be meritless.

¶ 29 Affirmed.

¶ 30 CAVANAUGH, J. files a dissenting opinion.

## DISSENTING OPINION BY CAVANAUGH, J.:

¶ 1 I cannot agree with the majority's conclusion that the order purportedly appealed from is an appealable collateral order under Pa.R.A.P. 313. Moreover, even if I agreed that the appeal was properly before us, I would not affirm, but would remand to the trial court as, in my view, the order appealed from is internally inconsistent. On the one hand, the order declares that the PNC brokerage account at issue is titled to Scott Radakovich, yet, on the other hand, the order remands the matter to a master to determine "whether the account should be treated as marital or non-marital property" with respect to "Bonnie L. and Richard L. Radakovich equitable distribution claims[.]" I fail to see how Bonnie and Richard Radakovich have any remaining entitlement to equitable distribution of an account which the court has concluded belongs solely to their son. Thus, I dissent.

¶ 2 The pertinent facts, as gleaned from my review of the record, show that Richard Radakovich (husband) and Bonnie Radakovich (wife) were married in 1976. Scott Radakovich (son) was born in 1980. From 1980 until April of 1996, husband and wife purchased a number of certificates of deposit which were informally earmarked for son's education. By April 1, 1996, those monies totaled approximately $85,000. On that date, which was some

eighteen months before wife filed for divorce, husband, with wife's acquiescence, placed the entire $85,000 into an irrevocable brokerage account for the benefit of son. The account eventually grew to approximately $113,000.

¶ 3 Wife filed for divorce in December of 1997. Equitable distribution hearings were conducted before a master, who, among other things, recommended distribution of the brokerage account funds. Both husband and wife filed exceptions to the master's recommendations. In May of 2000, the court entered an opinion and order which found that $48,000 of the brokerage account funds were non-marital and were set aside solely for son's educational expenses. The court concluded that the remainder of the money was subject to equitable distribution. Husband filed exceptions which the court denied. Husband appealed and this court quashed because no final decree in divorce had been entered.

¶ 4 In November of 2001, son filed a petition to intervene. Hearings on the petition were conducted, after which the court entered the following order, from which wife now appeals:

AND NOW, March 12, 2003, it is Ordered that:

1. PNC Brokerage Account No. 7784–0037 be transferred to Scott R. Radakovich; and,

2. Bonnie L. [a]nd Richard L. Radakovich's equitable distribution claims be remanded to a Master for determination as to a) whether the account should be treated as marital or non-marital property; and b) a recommended schedule of distribution of marital property.

3. The Master shall Petition the Court for prepayment of fees.

BY THE COURT

¶ 5 As the majority correctly concludes, the above order is not final and appealable, in part because no decree in divorce has yet been entered. Moreover, no interlocutory appeal as of right or by permission has been perfected. Nonetheless, the majority concludes that the portion of the order "declaring Son, as opposed to Husband and Wife, the owner of the PNC brokerage account is separate from and collateral to the parties' underlying divorce action and equitable distribution of property." I disagree.

¶ 6 As the majority recognizes, by a direct quotation contained in its articulation of the factual and procedural underpinnings, the trial court expressed the opposite opinion. The trial court opined that we should consider the determination of account ownership as final and appealable. It then stated "because that ownership is so *tightly intertwined with pending equitable distribution* [,]" any further equitable distribution hearings would be stayed pending resolution of the appeal. I cannot agree that a portion of an order in a divorce case in which no final decree has been entered is collateral to and separable from the divorce action and equitable distribution proceedings where the trial court has opined that the determination in question is inextricably intertwined with those unresolved issues. *See generally Wilson v. Wilson*, 828 A.2d 376 (Pa.Super.2003) (discussing non-appealability of equitable distribution orders claimed to be collateral to divorce action where no divorce decree has been entered).

¶ 7 Moreover, the trial court's rationale for immediate appealability, in my view, points out the inherent internal conflict and inconsistency in the order purportedly appealed from. The court has held that the account belongs to Scott. The court has also remanded the matter to the master to determine husband and wife's claims for equitable distribution of the account.

In my view, either the account belongs solely to Scott, and thus, is immune to his parents' equitable distribution claims, or the account doesn't belong solely to him, in which case, his parents can continue to fight over its proceeds.

¶ 8 In any event, I cannot agree that the order is appealable at this juncture. *See id.* Even if I could agree that the appeal is properly before us, perhaps on a finding that the trial court's express determination of finality under Rule 341 is valid, I would not proceed to a determination of the merits of the question regarding ownership of the account, but would remand to the trial court for an explication of its internally inconsistent disposition.[10]

¶ 9 Thus, I respectfully dissent.

---

**10.** I would note, however, that the court's determination that son is the owner of the account now that he has attained the age of majority is entirely consistent with the court's express statement that the account was created as an irrevocable trust for son's benefit under the Pennsylvania Uniform Transfers to Minors Act.