## Phebus v. UPMC Horizon

514

C.P. of Mercer County, no. 2001-4211.

*Darrell L. Kadunce,* for plaintiffs.
*Lynn E. Bell,* for defendant Graham.
*Michael D. Heintzman,* for defendant Sakkal.

DOBSON, *J.,* March 4, 2005—The matters currently before the court for disposition are the summary judgment motions of defendants Graham and Sakkal. For the reasons that follow, the motion of defendant Graham will be denied and the motion of defendant Sakkal will be granted.

Pa.R.C.P. 1035.2 provides that any party may move for summary judgment in whole or in part as a matter of law:

"(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would

require the issues to be submitted to a jury." Pa.R.C.P. 1035.2.

A court may grant a motion for summary judgment only where the right is clear and free from doubt. *Ducjai v. Dennis,* 540 Pa. 103, 113, 656 A.2d 102, 107 (1995). "The record must be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Marks v. Tasman,* 527 Pa. 132, 135, 589 A.2d 205, 206 (1991).

In opposing a motion for summary judgment, the adverse party "may not rest upon the mere allegations or denials of the pleadings." Pa.R.C.P. 1035.3(a). Instead, the nonmoving party "must adduce sufficient evidence on [all] issue[s] essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Ertel v. Patriot-News Co.,* 544 Pa. 93, 101-102, 674 A.2d 1038, 1042 (1996), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996).

Viewed in the light most favorable to plaintiffs as the nonmoving party, the facts central to both motions for summary judgment are summarized as follows. On December 15, 1999, plaintiffs' decedent, William Langiotti, was admitted to UPMC Horizon in Greenville, Pennsylvania, for treatment of pneumonia. (Depo. of Graham, p. 21.) Mr. Langiotti was also suffering from the complications of terminal lung cancer when he was admitted to the hospital. (Depo. of Sakkal, p. 32.) The decedent began having acute respiratory difficulties in the evening

hours of December 23, 1999, after vomiting and aspirating while eating his dinner.

Defendant Graham received a telephone call from the hospital regarding the decedent at approximately 12:05 a.m. on December 24, 1999. (Depo. of Graham, p. 26.) He initially advised the nurse to place the patient on a ventilator, move him to the intensive care unit, and give him Valium to ease his anxiety. Upon being advised by the nurse that the decedent was "DNR," meaning the patient had a do not resuscitate order in place, defendant Graham cancelled this order. He then ordered a small dose of Valium to ease decedent's anxiety. (Depo. of Graham, pp. 26-27.) Defendant Graham did not go to the hospital to see the decedent, in substantial part because he believed the patient was DNR. (Depo. of Graham, p. 30.) The decedent died at approximately 10:35 a.m. on December 24, 1999.[1]

Plaintiffs initiated this action on December 20, 2001, by filing a praecipe to issue a writ of summons. The writ of summons named as defendants Doctor Graham, Doctor Sakkal, and several others. Plaintiffs filed a complaint on June 6, 2002, and reissued the writ on July 16, 2002. Defendant Graham filed an answer on September 18, 2002, and defendant Sakkal filed an answer on March 5, 2004. Defendant Graham filed a motion for summary judgment on August 31, 2004, and defendant Sakkal filed

---

1. It is noted that there is a dispute as to whether defendant Graham or defendant Sakkal was the physician "on-call" on the evening of the decedent's death. There is also disagreement regarding whether there actually was a valid do not resuscitate order concerning the decedent. These questions are ones of fact, and for today's purposes, we resolve them in plaintiffs' favor.

a motion for summary judgment on October 29, 2004. Plaintiffs have attached an expert report and an amended expert report to their motions in opposition to summary judgment.[2] It is these motions for summary judgment that are currently before this court.

Defendant Graham moved for summary judgment on two theories: (1) that 42 Pa.C.S. §8331, commonly known as the Good Samaritan statute, provided him an absolute defense; and (2) the failure of plaintiffs' expert report to set forth sufficient evidence to support this cause of action against defendant Graham.

The Good Samaritan statute provides as follows:

*"Section 8331. Medical Good Samaritan civil immunity*

*"(a) General rule.*—Any physician or other practitioner of the healing arts or any registered nurse, licensed by any state, who happens by chance upon the scene of an emergency or who arrives on the scene of an emergency by reason of serving on an emergency call panel or similar committee of a county medical society, or who is called to the scene of an emergency by the police or other duly constituted officers of a government unit, or who is present when an emergency occurs and who, in good faith, renders emergency care at the scene of the emergency, shall not be liable for any civil damages as a result of any acts or omissions by such physician or practitioner or registered nurse in rendering the emergency care, except any acts or omissions intentionally designed to harm or any grossly negligent acts or omissions which result in harm to the person receiving emergency care.

---

2. A copy of the expert report and the amended expert report are attached hereto.

"*(b) Definition.*—As used in this section 'good faith' shall include, but is not limited to, a reasonable opinion that the immediacy of the situation is such that the rendering of care should not be postponed until the patient is hospitalized." 42 Pa.C.S. §8331.

There are a number of reasons that the Good Samaritan statute does not apply to the facts of the current case. Defendant Graham was not "at the scene of the accident" as required by the statute. Instead, he gave directions over the phone to the nurses who were at the hospital. Also, subsection (b) implies that the Good Samaritan statute does not apply to hospitalized patients. As the decedent was in the hospital, the statute does not apply. Therefore, the Good Samaritan statute does not provide defendant Graham with a defense to this action.

Defendant Graham next alleges that plaintiffs' expert report does not set forth sufficient evidence to hold him liable. We believe the evidence, when viewed in the light most favorable to plaintiffs as the nonmoving party, is sufficient to survive summary judgment on this theory. Regardless of whether or not he was the physician on call on the evening of the decedent's death, defendant Graham had a duty not to prescribe a drug that would worsen a patient's condition. According to plaintiffs' expert, defendant Graham did exactly that. Plaintiffs' expert indicated that it is medical error to prescribe Valium to a patient who is experiencing respiratory difficulty before that patient is placed on a ventilator. The expert further indicated that this error falls below the acceptable standard of care for a physician, and that the administration of the Valium contributed to decedent's death by respiratory failure. Although the expert report

is not as clear as the court would like regarding duty, breach, acceptable standard of care, and causation, we believe it is sufficient to provide plaintiffs the evidence necessary for their claims against defendant Graham to survive summary judgment. Defendant Graham's motion will, therefore, be denied.

The court having concluded that defendant Graham's motion for summary judgment must be denied, we now turn to the motion filed by defendant Sakkal. Defendant Sakkal moves for summary judgment on two independent grounds. The first ground is a statute of limitations and improper service argument. The second argument is that plaintiffs failed to adduce sufficient evidence to support a cause of action against defendant Sakkal. This court will only address the first theory, because our decision on that issue renders the second theory moot for purposes of defendant's current motion for summary judgment.

Defendant Sakkal first asserts that he is entitled to summary judgment based on a statute of limitations/improper service theory. On February 3, 2005, this court held an evidentiary hearing during which plaintiffs presented evidence of their efforts. Following the hearing, the court issued findings of fact. An amendment to these findings of fact was issued by this court on February 8, 2005. We hereby incorporate the findings of fact and the amended findings of fact.[3]

As viewed in the light most favorable to plaintiffs as the nonmoving party, the facts most relevant to defendant Sakkal's motion for summary judgment are as fol-

---

3. A copy of these documents is attached to this opinion.

lows. Plaintiffs' decedent, William Langiotti, died on December 24, 1999. A writ of summons was issued on December 20, 2001, four days before the statute of limitations expired. The Sheriff of Mercer County made an attempt to serve defendant Sakkal, but he could not be found. The complaint was filed on June 6, 2002, and the writ was reissued on July 16, 2002.

Having been unable to locate defendant Sakkal by traditional means, plaintiffs sought and were granted leave to serve process by publication on October 13, 2002, 10 months after the suit was initiated. This order also directed the plaintiffs to reinstate the complaint. Plaintiffs have presented no evidence of their efforts to serve defendant Sakkal after the initial attempt by the sheriff and prior to the October 13, 2002 order.

On December 17, 2002, plaintiffs sent a letter to an attorney who represented defendant Sakkal in a different matter in a further attempt to locate him. Plaintiffs presented no evidence of further attempts to locate defendant Sakkal after the October 13, 2002 order. Despite the court's direction to the contrary, plaintiffs neither reinstated the complaint nor reissued the writ after July 16, 2002. Plaintiffs also delayed publication until October of 2003, a full year after the court ordered plaintiffs to serve notice by publication.

Based on these facts, service upon defendant Sakkal is improper and the statute of limitations has elapsed for two individually sufficient but related reasons. The first reason is based on the requirements of Pa.R.C.P. 401 and 404 and the case law interpreting those rules. Rule 401(a) mandates that, in order for service to be effective, it must occur within 30 days of the issuance of the writ or the

filing of the complaint. Pa.R.C.P. 401(a). If service is not accomplished within this time period, the writ may be reissued or the complaint reinstated any number of times in order to provide more time to effectuate service. Pa.R.C.P. 401(b)(1).

For service outside the Commonwealth, the statutory time period is 90 days rather than 30 days. Pa.R.C.P. 404. It is the understanding of this court that sometime after the initial attempt to serve defendant Sakkal, plaintiffs were made to believe that defendant Sakkal was outside the Commonwealth of Pennsylvania. Therefore, we will err on the side of caution and use the longer 90-day period provided by Rule 404 in our analysis of this issue.

Defendant was served notice by publication in October 2003. The last time the writ was reissued was July 16, 2002. The complaint was not reinstated after its initial filing on June 6, 2002. Therefore, service of defendant Sakkal by publication did not occur within 90 days of the reissuance of the writ or reinstatement of the complaint. Service made after expiration of the 30-day limit on service (90 days for service outside the Commonwealth) may be considered void. *Fox v. Thompson,* 377 Pa. Super. 39, 546 A.2d 1146 (1988). Therefore, the service by publication in October 2003 of defendant Sakkal was ineffective and void. Defendant Sakkal's motion for summary judgment must therefore be granted, and plaintiffs' claims against him must be dismissed.[4]

---

4. It is noted that defendant Sakkal can no longer be properly served in this case. A plaintiff may reinstate a complaint or reissue a writ any time after the initiation of the lawsuit for a period equal the original statute of limitations for the underlying action. *Smith v. City of Philadelphia,* 148 Pa. Commw. 84, 609 A.2d 873 (1992). Since more than

Service of defendant Sakkal is also improper based on the logic of *Lamp v. Heyman,* 469 Pa. 465, 366 A.2d 882 (1976), and its progeny. These cases stand for the proposition that the statute of limitations is not tolled, despite the provisions of Pa.R.C.P. 401 and 404, for any time period during which the plaintiff did not undertake good faith efforts to serve a defendant. See *e.g., Cahill v. Schults,* 434 Pa. Super. 332, 643 A.2d 121 (1994).

There is no mechanical approach for courts to apply in determining what constitutes good faith efforts to serve a defendant—analysis must be on a case-by-case basis. *Cahill v. Schults,* 434 Pa. Super. at 337, 643 A.2d at 123. Some factors to be considered are whether the plaintiff complied with the rules of civil procedure, the timeliness of the service, and the number of times the plaintiff attempted service. *Ramsay v. Pierre,* 822 A.2d 85 (Pa. Super. 2003). It is the plaintiffs' burden to show that their efforts were reasonable. *Cahill v. Schults,* 434 Pa. Super. at 337, 643 A.2d at 123.

Based on the facts of this case, it is clear to this court that plaintiffs have failed to meet their burden of showing the reasonableness of their attempts to serve defendant Sakkal. Plaintiffs did make one attempt to serve defendant Sakkal at his last known address shortly after the writ was issued in December 2001. Plaintiffs made no other attempt at service prior to October 2003. The plaintiffs' only other effort to locate defendant Sakkal occurred in December 2002, when plaintiffs wrote a letter to a former counsel of defendant Sakkal. Other than

two years have passed since the writ was first issued, the writ cannot be reissued and the complaint cannot be reinstated at this date. Therefore, service of defendant Sakkal is no longer possible.

this letter, there is no evidence of even minimal efforts to locate defendant Sakkal during the approximately 21 months that elapsed between the initial sheriff's return in January 2002 and the service by publication in October 2003. The 22-month lapse between the initiation of the lawsuit and the service by publication, along with the scant efforts to locate and serve defendant Sakkal, strongly suggest that plaintiffs did not exercise good faith in attempting to serve defendant Sakkal. *Ramsay v. Pierre,* 822 A.2d 85 (Pa. Super. 2003). Plaintiffs' conduct certainly served to stall in its tracks the legal machinery plaintiffs set in motion by issuing the writ in December 2001. *Lamp v. Heyman,* 469 Pa. at 478, 366 A.2d at 889.

This court is most influenced, however, by the fact that plaintiffs waited a full year after being permitted by court order to serve notice by publication to actually publish that notice. This 12-month delay is inexcusable. Plaintiffs also never reinstated the complaint despite an express instruction to do so. Again, utilizing the arguments of *Ramsay v. Pierre,* we find that, although plaintiffs did make at least some effort to comply with the Rules of Civil Procedure, plaintiffs disregarded an order of court, and that this blatant disregard of an order of court constitutes a clear lack of good faith under *Lamp* and *Ramsay.*

We hereby hold that plaintiffs did not exercise good faith in their attempt to serve defendant Sakkal. Based on *Lamp v. Heyman* and its progeny, the statute of limitations was not tolled for all time periods when plaintiffs were not utilizing good faith efforts. As only four days remained on the original statute of limitations before

plaintiffs filed the writ on December 20, 2001, the statute of limitations ran as to defendant Sakkal long before plaintiffs served him by publication in October 2003.

Based on these reasons, defendant Sakkal was never properly served with notice within the statute of limitations.[5] Defendant Sakkal's motion for summary judgment

---

5. This court is cognizant of the procedural nightmare that the statute of limitations and improper service issues present under the particular facts of this case. Defendant Sakkal did not file preliminary objections, instead raising the statute of limitations and improper service issues in his answer and new matter. Defendant Sakkal also failed to include a notice to plead with his new matter.

This court has discussed two key issues regarding the statute of limitations and improper service arguments of defendant Sakkal. As discussed in the text of this opinion, these two issues are plaintiffs' compliance with Pa.R.C.P. 401 and 404 and whether plaintiffs undertook good faith efforts to serve defendant Sakkal pursuant to the requirements of *Lamp v. Heyman.* There seems to be some confusion in the case law about whether arguments of this nature are really arguments regarding improper service, which must be raised on preliminary objection, or arguments relating to the statute of limitations, properly raised in new matter.

Pa.R.C.P. 1028(a)(1) provides that issues relating to improper form of service must be raised in a defendant's preliminary objections. If such arguments are not raised on preliminary objection, they will be deemed waived. *Cinque v. Asare,* 401 Pa. Super. 339, 343, 585 A.2d 490, 492 (1990). *Cinque* expressly states that defects in service cannot be collaterally attacked by asserting the statute of limitations in a defendant's answer and new matter, but instead must be addressed in preliminary objections. It seems at least arguable that because this lawsuit was initiated within the prescribed statute of limitations, defendant Sakkal's statute of limitations argument is based on the failure of plaintiffs to properly serve defendant Sakkal within the tolling period, and therefore would be deemed waived by defendant's failure to file preliminary objections.

Despite this possible broad reading of *Cinque,* two Superior Court cases indicate that *Lamp v. Heyman* good faith arguments are properly raised in a defendant's answer and new matter. *Devine v. Hutt,* 863

will therefore be granted, and plaintiffs' claims against defendant Sakkal will be dismissed. It is not necessary to decide defendant Sakkal's second argument relating to the merits of plaintiffs' claim against him, as our ruling on the statute of limitations argument renders that issue moot. Defendant Sakkal will remain in the suit for purposes of defendant Graham's cross-claim only.

And hence this order:

---

A.2d 1160 (Pa. Super. 2004); *Moses v. T.N.T. Red Star Express,* 725 A.2d 792 (Pa. Super. 1999). Although *Moses* does not directly address the issue, instead proceeding to discuss the merits of the good faith issue without reference to whether the argument had to be made at preliminary objection, *Devine* expressly states that *Lamp v. Heyman* arguments are in fact statute of limitations arguments and not improper service arguments that must be raised on preliminary objection. These three cases, when considered together, indicate that the Rule 401/404 argument should have been raised on preliminary objection, but the *Lamp v. Heyman* issue was properly raised in defendant Sakkal's new matter.

This court need not address this procedural quagmire, however, because plaintiffs proceeded to argue the merits of defendant Sakkal's statute of limitations issue argument, and have never objected to the fact that defendant Sakkal improperly raised the service issue in new matter. Although stated in much more succinct form, Rule L210 mirrors Pa.R.A.P. 2111-2119 which govern the contents of appellate briefs. Pursuant to the appellate rules, arguments not raised in the appellate brief are deemed waived. See *e.g., Radakovich v. Radakovich,* 846 A.2d 709, 717 (Pa. Super. 2004). By analogy, we conclude that pursuant to Rule L210, since plaintiffs failed to raise any possible procedural defects in either their brief or their argument, the issue is not properly before the court, and we will decide the issue of improper service/statute of limitations on the merits. It is not the duty or function of this court to become an advocate for the plaintiffs. *Id.* Moreover, a review of the case law indicates that *Lamp v. Heyman* good faith arguments are statute of limitations arguments properly raised as new matter, and the good faith argument is sufficient to require dismissal of plaintiffs' claims against defendant Sakkal.

## ORDER

And now, March 4, 2005, it is hereby ordered that defendant Graham's motion for summary judgment is denied. It is further ordered that defendant Sakkal's motion for summary judgment is granted, and summary judgment is entered in favor of defendant Sakkal and against plaintiffs on plaintiffs' complaint.

---

## Exhibit A

C.H. McGowen MD
90 Oaktree Lane
Warren, OH 44484
October 11, 2004
Atty. D.J. Kadunce
300 North McKean St.
Butler, PA 16001

Dear Atty. Kadunce:

Having written to you earlier in the case regarding Richard Langiotti (deceased), I have reviewed the subsequent information which you sent; a deposition of Dr. Saad Sakkal who now resides in Syria. Since Dr. Sakkal's testimony, which represents new information, is diametrically opposed to that of Dr. David Graham, I reserve the right to revise and extend my remarks in this case.

I will not repeat all of the facts in the case, as they are well known to you, but I will refer to my previous letter of June 19, 2004, and the pertinent facts therein where revisions need to be made in regard to the culpability of Dr. David Graham.

The "do not resuscitate" (DNR) order which was placed on the patient's chart on December 21, 1999, had apparently been the work of Dr. Sakkal; as per his own testimony. While there seems to be some question as to the family's understanding of that order and their agreement or disagreement with it, the fact remains that Dr. Sakkal thought it prudent to write for a DNR in view of Mr. Langiotti's terminal and hopeless physical state. However, it is unethical to write that without a family's or a patient's full understanding of what it will mean. Mr. Langiotti's family was obviously unaware of the order, the implications for future care or its consequences.

Dr. Sakkal insisted in his sworn testimony that he was not on call on the evening of December 23, 1999. Instead he insisted that it was his associate, Dr. David Graham's call night. Dr. Graham has insisted, in a previous testimony, that it was Dr. Sakkal who was on call. It is impossible for me to determine with absolute certainty if it was truly Dr. Sakkal or Dr. Graham that was on call on the day of December 23, 1999. However, given the newly received testimony of Dr. Sakkal in which he stated that he did discuss Mr. Langiotti's care with Dr. Graham, the fact that he had placed a DNR order on Mr. Langiotti's chart would certainly have been included in that discussion. Furthermore, since that newly-received testimony clearly states that Dr. Graham was on call, with full responsibility to provide quality care for Mr. Langiotti, on the dates of December 23, 1999 and December 24, 1999, my opinion with regard to the responsibility and liability of Dr. Graham must of necessity change. If Dr. Sakkal's testimony is to be believed, Dr. Graham had a medical, ethical and moral duty to pro-

vide Mr. Langiotti with the utmost quality care and management, as I will outline below.

Dr. Graham's Valium order was still improper given the IW's respiratory problems. A sedative such as that should await the application of a ventilator following intubation unless the patient and or family have decided on a passive euthanasia approach to the terminal state; which was obviously not the case here given the irate nature of the son when learning of the DNR order. Furthermore, Dr. Graham's failure to go in to see a patient about whom he knew so little is not only an error in judgement but also falls short of a reasonable standard of medical practice. When one physician is taking call for another physician, the latter's patients should not fall through the cracks. Any time a patient's condition goes from bad to worse that person deserves to have a physician lay hands on him or her very promptly. The only way that a physician can ever possibly know what is really transpiring in an acutely ill patient is to make a personal bed side visit, take an adequate history from the patient, the family or nursing staff and then do a complete physical exam. Upon deciding on a particular plan of attack for diagnosing and treating the problem the physician should then linger until he sees if his plan was effective. The unfortunate issue here is that none of the several physicians involved in this case ever came in to examine the patient between the time during which he aspirated food into his tracheo-bronchial tree and his demise several hours later.

The failures to meet the usual and reasonable standards of medical practice by each of the doctors whom I addressed in this letter, and in my previous report, were

a direct and proximate cause of the untimely death of Mr. Langiotti. While it is impossible to know for certain how long Mr. Langiotti would have lived, given his on-going battle with terminal cancer, it can be stated with a reasonable degree of medical certainty that the failure by the defendants to meet the medical standards that I have outlined in this letter and my previous report, were contributory factors in Mr. Langiotti's uncomfortable and early demise.

My previous comments regarding the culpability of the UPMC Horizon hospital system and Aiman Dsag-nestani MD were not altered by Dr. Sakkal's testimony and thus remain as stated in my former letter to you, dated June 19, 2004.

Yours truly,
/s/C.H. McGowen MD
C.H. McGowen MD

---

### Exhibit B

Charles H. McGowen MD
90 Oaktree Lane
Warren, OH 44484
June 19, 2004
D.J. Kadunce
300 North McKean St.
Butler, PA 16001

Dear Atty. Kadunce:

I have reviewed all of the medical documentation which you have sent to me regarding the case of Richard

Langiotti (deceased), and have reached several conclusions.

As you know, Mr. Langiotti was, at the time of his demise, a 74-year-old gentleman who suffered from a non-small cell lung cancer that had metastasized to his brain. He was admitted to the UPMC Horizon health care facility on December 15, 1999, for the treatment of pneumonia. When, after nine days of appropriate treatment he had sufficiently stabilized he was transferred to Horizon's Transitional Care Unit (TCU) on December 23, 1999. It was there that a series of unfortunate events, upon which I shall comment, transpired that ultimately led to his demise.

While Mr. Langiotti had been confined to the acute care facility he had been receiving supplementary oxygen therapy by way of a cannula. When he was in the TCU, for some reason that is not particularly clear, there came an order to place a full face mask on him; he was reportedly eating his dinner at the time. Soon thereafter he vomited and aspirated. It was then that his course began a downward spiral and he was drawn into the vortex of death.

As I have reviewed the defendants in this case I find four most culpable: Aiman Dagnestani MD, Saad Sakkal MD, David Graham DO and UPMC Horizon.

Dr. Dagnestani, a medical oncologist, was the attending physician and it was his primary responsibility to closely follow his patient during his time in the acute care hospital and the TCU. On December 21, 1999, a "do not resuscitate" (DNR) order was placed in the chart. That was allegedly done without the permission of either the patient or his family, but with Dr. Dagnestani's

full knowledge. That is inappropriate, unethical and utterly against hospital policy. It even borders on depraved indifference. It was Dr. Dagnestani whom the nurses first notified after the patient had vomited at approximately 6 p.m. on the evening of December 23, 1999, and he gave telephone orders but did not come in to the TCU to examine his patient. Following those orders, the nurse gave IV Ativan, a respiratory depressant. Giving such a soporific drug to a person in need of supplemental oxygen therapy is inappropriate and unreasonable.

Dr. Sakkal was apparently the primary care physician and associate of Dr. Graham who was reportedly on call for his group on the evening of December 23, 1999, but he could not be reached by pager or by phone, according to the nurses. Dr. Graham's testimony was that his pager was off because Dr. Sakkal was the one on call. Dr. Sakkal's inaccessibility during his on-call time makes him culpable in this case.

Dr. Graham is unfortunately the recipient of bad information and he acted accordingly. His first inclination was to admit the patient to the medical intensive care unit (MICU) upon hearing of his extreme condition. However, when told that the patient was "DNR" he rescinded the order. Dr. Graham did err at 12:05 a.m. when he gave a patient Valium who was already having trouble with his respirations. It was then that he had ordered the transfer to the MICU. It is proper to sedate an anxious patient who has been placed on a ventilator, but not until then. Dr. Graham did not come in to see the patient; however, he was not the patient's primary care physician, the one on call, nor did he think that he could alter the course of a patient with a DNR status.

The unfortunate issue here is that no physician actually laid hands on this patient during his time of extremis, between the aspiration of food and his death several hours later. Neither Dr. Dagnestani, nor the physician taking his call, if there was one, nor Dr. Sakkal who could not be reached.

Pradeep Kumar MD, a cardiologist, was asked to see Mr. Langiotti on December 20, 1999, and gave telephone orders, without seeing the patient. That is a bad practice, but one does not know the circumstances connected with his inability to see the patient in the early evening that day. This physician was not responsible for the patient's care on the evening of December 23, 1999, and should not be held liable for the events that transpired.

UPMC Horizon was remiss in not providing an in-house physician to manage such cases. One cannot fault them for the understaffing of the TCU, however, as patients there should not require the close staff monitoring that Mr. Langiotti did in his last hours of life. However, realizing the marked change in the patient's condition and failing to insist on his return to the acute care facility, the nurses who are employed by UPMC Horizon were in error. There are physicians connected with the hospital who can take command in such cases. Of course the DNR on the patient's chart could well have influenced their inaction and failure to be more insistent that physicians be paged more often.

The main litigant here seems to be Aiman Dsagnestani MD. He was the admitting physician and his DNR order determined the course of events that were followed after the nurses reached Dr. Graham. Furthermore, the DNR order may have also subtly affected the urgency, or non-

urgency, with which the nurses responded to Mr. Langiotti's problems. It was he who first knew of the patient's vomiting and aspiration and it was he who gave the IV Ativan that began the downward spiral of respiratory depression from which the man died. His blood oxygen levels were extremely low and his blood carbon dioxide levels extremely high prior to his demise.

One can only guess at what Mr. Langiotti's quality of life would have been had he not aspirated. He was a man with terminal cancer and would have likely been confined to the TCU or his home under the care of hospice. However, he was deprived of those final hours, days or weeks when he could say his final goodbyes to his family and enjoy whatever time he had left; only God knows.

Yours truly

/s/C.H. McGowen MD
C.H. McGowen MD

---

## FINDINGS OF FACT

And now, February 3, 2005, this matter being before the court for an evidentiary hearing on plaintiffs' efforts to serve defendant Sakkal; and after receipt of testimony, the court makes the following findings of fact:

(1) On December 24, 1999, William Langiotti died.

(2) On December 20, 2001, summary judgment was filed.

(3) On January 15, 2002, notice of sheriff was termed indicating defendant Sakkal could not be found.

534

(4) On June 6, 2002, the complaint in this matter was filed.

(5) On July 16, 2002, the writ was reissued.

(6) On October 10, 2002, plaintiff filed a motion for leave to serve by publication and said motion was granted on October 13, 2002.

(7) By letter dated December 17, 2002, plaintiff sent a letter to Attorney Silverman in Pittsburgh, whose firm was listed as representing Dr. Sakkal in other matters, asking for information regarding the whereabouts of Dr. Sakkal. No response was received to said letter.

(8) In October of 2003, plaintiffs served Dr. Sakkal via publication pursuant to the order of October 13, 2002.

---

AMENDED FINDINGS OF FACT

And now, February 8, 2005, the court having discovered a clerical error, the second finding of fact of February 3, 2005, is amended to read as follows: "On December 20, 2001, a writ of summons was filed."