**[J-26-2017]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| IN RE: ESTATE OF ALFRED E. PLANCE, JR., DECEASED | : | No. 25 WAP 2016 |
| | : | |
| | : | Appeal from the Order of the Superior |
| | : | Court entered December 8, 2015, at No. |
| APPEAL OF: JOY PLANCE | : | 1379 WDA 2014, reversing the Order of |
| | : | the Court of Common Pleas of Beaver |
| | : | County entered July 22, 2014, at No. |
| | : | 04-13-00855 and remanding. |
| | : | |
| | : | ARGUED:  April 4, 2017 |


**OPINION**


JUSTICE WECHT                                    DECIDED:  DECEMBER 19, 2017

We granted allowance of appeal to determine rightful title to a parcel of real property claimed by competing grantees, each of whom invokes a real or purported conveyance from the property's owner.  We granted review to consider as well the application of *res judicata* and collateral estoppel during estate administration proceedings with regard to an earlier order of the Orphans' Court determining the validity of a will.

Relying upon a presumption that valid delivery of a deed occurs on the date of its execution and acknowledgment, the Superior Court held that title to the real estate vested in the grantee of the earlier, unrecorded instrument.  The Superior Court further held that, where the Orphans' Court determined that a will was valid and permitted a photocopy of that will to be probated, a participating party's subsequent claim that the will was revoked is barred by the doctrines of *res judicata* and collateral estoppel.

After review, we reverse the order of the Superior Court, and we remand for further proceedings consistent with this Opinion.

## I. Background[1]

Alfred E. Plance, Jr. ("Alfred"), owned a 146-acre farm, which straddles the boundary between Beaver and Washington Counties. Following the death of his first wife in 1990, Alfred became the sole owner of the farm as a surviving tenant by the entireties. Alfred and his first wife had three sons, Timothy Plance ("Timothy"), Christopher Plance ("Christopher"), and Steven Plance ("Steven"). Alfred remarried in 1994, and his new wife, Joy Plance ("Joy"), began residing with him on his farm. Joy sold her former residence. She used $34,000.00 of the proceeds, as well as $40,000.00 borrowed from her father, to construct a horse boarding stable on the farm. Alfred and Joy operated the stable together until 2011 or 2012, when their declining health made its continued operation impractical.

On August 20, 2004, Alfred executed two land trust agreements, creating two trusts for the purpose of holding title to the farm—one trust for the portion of the farm situated in Beaver County and the other for the portion situated in Washington County. Alfred named himself as trustee of the trusts, and designated himself and Timothy as the beneficiaries. On the same day, Alfred executed and acknowledged[2] two deeds ("2004 Deeds"), one corresponding to each trust, conveying the associated portions of

---

[1] While the underlying facts largely are undisputed, the following account derives from those found by the Orphans' Court, to which we afford great deference in the determinations of fact, credibility, and the resolution of any conflicts in testimony. *See Adoption of S. H.*, 383 A.2d 529, 530 (Pa. 1978).

[2] As used herein, "acknowledgment" refers to "[a] formal declaration made in the presence of an authorized officer, such as a notary public, by someone who signs a document and confirms that the signature is authentic." *Acknowledgment*, BLACK'S LAW DICTIONARY 27 (10th ed. 2014).

the farm from himself as the grantor (in his personal capacity) to himself as the grantee (in his capacity as trustee). The trust documents and deeds were prepared and notarized by Lawrence Bolind, Esquire. Although it was Attorney Bolind's ordinary and customary practice to record deeds for his clients after their execution, he did not record the 2004 Deeds. *See* Notes of Testimony ("N.T."), 5/20/2014, at 15.[3] Alfred retained the 2004 Deeds, but never recorded them.

On April 26, 2006, Alfred executed two deeds ("2006 Deeds") conveying the entirety of the farm to himself and Joy as tenants by the entireties. Alfred executed these deeds as the grantor in his individual capacity, not as the trustee of the land trusts that he had established nearly two years earlier. The 2006 Deeds were recorded promptly in both Beaver and Washington Counties.

In early 2012, Alfred and Joy were approached by Range Resources-Appalachia LLC ("Range Resources"), which sought to obtain an oil, gas, and coalbed methane lease with respect to the farm. Alfred and Joy executed the lease and, in exchange, Range Resources issued a check in the amount of $439,650.00, payable to both Alfred and Joy as tenants by the entireties and owners of the fee simple title.

In the spring of 2012, Alfred was hospitalized for an autoimmune condition. Upon his release, Timothy and Timothy's wife, Shawnna, arranged for Alfred to meet their attorney, Michael Werner, Esquire, so that Alfred could review and revise his estate plan. Timothy and Shawnna accompanied Alfred to his appointment with Attorney Werner. Alfred provided Attorney Werner with the signed and notarized

---

3 Attorney Bolind later testified that, although he recognized the documents to be his work product, he had no recollection of his relationship with Alfred and no memory of performing legal services on Alfred's behalf. *See* N.T., 5/20/2014, at 6-7. Attorney Bolind further explained that he had no notes or records of his meeting with Alfred because his office, computers, and files were damaged by flooding from Hurricane Ivan in September 2004. *Id.* at 8.

originals of the land trust agreements and the unrecorded 2004 Deeds, as well as the recorded 2006 Deeds. Alfred also told Attorney Werner that he was concerned about the disposition of the Range Resources check. The check had been mailed to the farm while Alfred was in the hospital, and, due to problems in his relationship with Joy, Alfred was concerned about his ability to access the funds. Attorney Werner, concluding that the 2004 Deeds had transferred title to the farm into the trusts, advised Alfred to contact Range Resources and to request a "stop payment" order on the check because the payees named on the check—Alfred and Joy as tenants by the entireties—were not the true owners of the farm. Attorney Werner further advised Alfred to record the 2004 Deeds, but cautioned that doing so "would open up a very large can of worms from which it would be very difficult to turn back." N.T., 5/19/2014, at 42. Despite Attorney Werner's advice, Alfred never recorded the 2004 Deeds.

Based upon his discussion with Alfred, Attorney Werner prepared a new will and other estate planning documents for Alfred. Attorney Werner met with Alfred, again accompanied by Shawnna, to execute these documents on May 24, 2012. Alfred's new will included $1,000.00 bequests to each of his sons and gave the residue to Timothy, or to Christopher in the event that Timothy predeceased Christopher. Although the will acknowledged Joy as Alfred's wife, it made no provision for Joy. Alfred named Timothy as his executor. After Alfred executed the will, he gave the original to Shawnna. Shawnna placed the will, along with other documents from the earlier meeting with Attorney Werner, into a plastic file box, which she kept in her home until early August 2012.

After the execution of Alfred's estate planning documents, Attorney Werner received several telephone calls from Alfred and Shawnna, giving him conflicting instructions with regard to the Range Resources check and the 2004 Deeds. Shawnna

called Attorney Werner in late June 2012 and told him not to record the 2004 Deeds and not to request a stop payment order on the check. Six days later, Shawnna called again and instructed Attorney Werner to proceed with the stop payment order. Alfred left Attorney Werner two messages, first asking him to contact Range Resources and then instructing him not to contact Range Resources. Finally, on July 9, 2012, Attorney Werner called Alfred, and Alfred told him not to proceed with either the stop payment order or the recordation of the 2004 Deeds. Alfred requested that Attorney Werner return all of the documents in his possession, both originals and copies. That same day, Attorney Werner complied with Alfred's request, mailed all of the documents in his possession to Alfred, and took no further action with regard to the Range Resources check or the 2004 Deeds.

According to Timothy, Alfred and Shawnna had a "falling out" in early August 2012. N.T., 5/19/2014, at 106-07. At that time, Alfred asked Shawnna for all of the documents in her possession, and she provided him with the plastic box containing his will and other estate planning documents. Joy later explained that, one day in August or September 2012, Alfred entered their residence carrying a plastic box. He told Joy that he had a conflict with Timothy and Shawnna, and that he would not communicate with them in the future. Joy did not know what the plastic box contained, but she observed Alfred taking the box outside to a trash burner and burning its contents. Although Shawnna and Attorney Werner retained copies of Alfred's will, none of Alfred's original documents ever were discovered.

Alfred died in March 2013. Unable to locate Alfred's original will, which was last seen in the plastic box, Timothy filed a petition to probate a photocopy of the will. Joy did not file a response, but she retained counsel, who appeared before the Orphans'

Court to object to Timothy's petition. After a hearing, which was not transcribed, the Orphans' Court entered the following order:

> AND NOW, this 27th day of August, 2013[,] it appearing that the original of the testator's Last Will and Testament has been lost and misplaced and that the testator has not destroyed the original with the intention of revocation, it [is] hereby ORDERED, ADJUDGED AND DECREED that the probate is granted using the photocopy of the Last Will and Testament.

Order, 8/27/2013. Despite the Orphans' Court's determination that Alfred's will remained valid, the court apparently intended that its order would not preclude Joy from challenging the will at a later time. Although no transcript of the proceeding exists, the Orphans' Court later noted in its Pa.R.A.P. 1925(a) opinion that "the parties agreed that the court did indicate in motions court on August 27, 2013 when the photocopy was admitted, that the will itself could still be challenged or contested." Orph. Ct. Op., 10/28/2014, at 2. Joy did not appeal the Orphans' Court's order admitting the photocopy of Alfred's will to probate.

Timothy was granted Letters Testamentary on October 2, 2013. On November 21, 2013, Timothy filed a petition with the Orphans' Court, alleging that Joy had dissipated property belonging to the estate, including gold coins with a value of approximately $100,000.00 and a large portion of the funds from the Range Resources check. Timothy averred that Joy's actions had rendered him unable to administer Alfred's estate, and that Joy should be ordered to refrain from further dissipating any estate property, to account for any property previously dissipated, to return or reimburse the estate for any such property, and to allow Timothy to access and inventory any remaining estate property.

Joy filed a response to Timothy's petition on December 12, 2013, denying that she had dissipated property belonging to the estate. In new matter, Joy asserted that

Alfred had revoked his will by burning it and, as such, had died intestate. Joy further asserted ownership of the farm as a surviving tenant by the entireties pursuant to the 2006 Deeds. Timothy responded to Joy's new matter, averring that the issue of the validity of Alfred's will already had been litigated and decided when the Orphans' Court issued its order admitting the photocopy of Alfred's will to probate on August 27, 2013. Thus, Timothy argued, Joy's claim was barred by the doctrines of *res judicata* and collateral estoppel. With regard to the ownership of the farm, Timothy claimed that the 2004 Deeds effectively transferred title to the farm into the trusts, and that the 2006 Deeds were, therefore, void *ab initio*.

Following discovery, the parties proceeded to trial before the Orphans' Court on May 19 and 20, 2014. On July 22, 2014, the Orphans' Court issued a memorandum and decree, holding that Joy "possesses the superior title" to the farm, that its August 27, 2013 order admitting the photocopy of Alfred's will to probate "was improvidently entered and is hereby revoked," and that Alfred died intestate. Decree, 7/22/2014. The Orphans' Court reasoned that Alfred never intended the 2004 Deeds to be an effective conveyance and, thus, did not deliver the deeds.[4] The court concluded that Joy owned the farm as a surviving tenant by the entireties pursuant to the 2006 Deeds. With regard to *res judicata* and collateral estoppel, the Orphans' Court concluded that the doctrines did not preclude Joy's challenge to Alfred's will because, at the time of the August 27, 2013 order, the court intended to allow Joy to proceed with such a challenge at a later date. The court further noted that, before it entered the order authorizing probate of the photocopy of Alfred's will, "[t]here was not a hearing convened, no

---

[4] As discussed in detail, *infra*, delivery of a deed is essential to a valid conveyance, and is a matter of the grantor's intent to pass title to the property to the grantee. *See, e.g., Stiegelmann v. Ackman*, 41 A.2d 679, 681 (Pa. 1945); *Lewis v. Merryman*, 114 A. 655, 655 (Pa. 1921).

evidence was presented and [Joy] was not afforded due process." Orph. Ct. Op., 10/28/2014, at 2. Accordingly, the Orphans' Court opined that neither *res judicata* nor collateral estoppel prevented it from considering Joy's claim that Alfred revoked his will. Having credited Joy's evidence, the Orphans' Court concluded that it should not have authorized probate of the photocopy because Alfred revoked his will and, thus, died intestate. The court directed the Register of Wills to remove Timothy as the executor of Alfred's estate. Timothy appealed the Orphans' Court's decree to the Superior Court.

On appeal, Timothy argued that Alfred's execution and acknowledgment of the 2004 Deeds was sufficient to constitute delivery of those deeds and to demonstrate his intent to convey the farm to the trusts, that the 2006 Deeds accordingly were void, and that the doctrines of *res judicata* and collateral estoppel precluded Joy from challenging the validity of Alfred's will. In response, Joy argued that Alfred never delivered the 2004 Deeds, that she possessed superior title to the farm as a surviving tenant by the entireties pursuant to the recorded 2006 Deeds, that she was a *bona fide* purchaser of the farm protected by Pennsylvania's recording statutes,[5] and that neither *res judicata*

_____

[5]     21 P.S. § 351 provides that all deeds shall be recorded in the county in which the subject land is situated, and that a deed "shall be adjudged fraudulent and void as to any subsequent *bona fide* purchaser . . . without actual or constructive notice unless such deed . . . shall be recorded, as aforesaid, before the recording of the deed . . . under which such subsequent purchaser . . . shall claim." 21 P.S. § 351. This is commonly known as a "race-notice" statute, a "recording law providing that the person who records first, without notice of prior unrecorded claims, has priority." *Race-notice statute*, BLACK'S LAW DICTIONARY 1448 (10th ed. 2014). Joy also cited 21 P.S. § 444, titled "All deeds made in the state to be acknowledged and recorded within ninety days." Omitting any reference to a "*bona fide* purchaser," Section 444 provides that a deed remaining unrecorded for more than ninety days after its execution "shall be adjudged fraudulent and void against any *subsequent purchaser or mortgagee for a valid consideration* . . . ." 21 P.S. § 444 (emphasis added). Despite the slight variation in the descriptions of the subsequent purchaser contemplated by the statutes, this Court has explained that, with regard to both Section 351 and Section 444, "[t]o bring one within the protection of the statutes it must be shown that one has the status of a *bona fide* purchaser." *Wheatcroft v. Albert Co.*, 180 A.2d 216, 219 (Pa. 1962).

nor collateral estoppel applied to her challenge to the validity of Alfred's will because the Orphans' Court's earlier order was not final, but was part of the ongoing litigation.

The Superior Court reversed the decree of the Orphans' Court. *See In re Estate of Plance*, 1379 WDA 2014 (Pa. Super. Dec. 8, 2015) (unpublished). Regarding the effectiveness of the 2004 Deeds, the Superior Court noted that, although the recording of a deed raises a presumption of its validity, recording is not essential to a conveyance; rather, title to real estate may be passed by valid delivery of a deed, which is a question of the grantor's intent. *Id.*, slip op. at 9 (citing, *inter alia*, *City Stores Co. v. Philadelphia*, 103 A.2d 664, 666 (Pa. 1954), and *Stiegelmann v. Ackman*, 41 A.2d 679, 681 (Pa. 1945)). Thus, although the 2004 Deeds never were recorded, the Superior Court recognized that the 2004 Deeds nevertheless would have been effective to transfer title to the farm into the trusts if Alfred effectuated a valid delivery of those deeds. The Superior Court noted that it is a "general rule that there is a presumption, [in] the absence of proof to the contrary, that a deed was executed and delivered on the day it was acknowledged." *Id.* (alteration in original) (quoting *Herr v. Bard*, 50 A.2d 280, 281-82 (Pa. 1947)).

The court reasoned that the Orphans' Court had placed undue weight upon Alfred's failure to record the 2004 Deeds, which was not dispositive. Rather, the Superior Court observed that Alfred, "as grantor, executed, acknowledged and delivered the deeds to himself, as trustee/grantee of the two trusts he executed that same day." *Id.* at 10. Pursuant to the rebuttable presumption identified in *Herr*, the Superior Court reasoned that Alfred's execution and acknowledgment of the 2004 Deeds, as well as his possession of the 2004 Deeds in his capacity as the grantee, was sufficient to constitute delivery and to convey the farm to the trusts. The court concluded that "Joy presented no evidence to rebut the presumption that, at the time [Alfred] executed and

acknowledged the deeds and delivered them to himself as trustee, he intended to transfer ownership of the Farm to the trusts." *Id.*

Importantly, the Superior Court noted that Alfred was both the grantor and the grantee of the 2004 Deeds, which distinguished this case from the precedents upon which Joy relied. Although a grantor generally must transfer control over a deed in order to effectuate delivery to the grantee, the Superior Court held that, due to Alfred's dual capacities, "indicia of delivery such as 'relinquishment of control,' or delivery to a third party with instructions to pass on to the grantee, are not relevant to our analysis." *Id.* (citations omitted).

The Superior Court further rejected Joy's assertion that, even if the 2004 Deeds were valid, her interest in the farm was protected under the recording statutes due to her status as a *bona fide* purchaser. To that end, Joy averred that she had paid valid consideration for the farm through her investment in the horse boarding stable, and that consideration also may be found in the "natural love and affection between spouses." *Id.* at 12 (quoting Superior Court Brief of Joy at 13). The Superior Court noted that, under its precedent, a grantee of land qualifies as a *bona fide* purchaser if she was "(1) without notice of an adverse interest and (2) gave value for the purchase of the land." *Id.* (citing *Roberts v. Estate of Pursley*, 718 A.2d 837, 841 (Pa. Super. 1998)). Joy was not a *bona fide* purchaser, the court reasoned, because there was no indication that she paid valid consideration to Alfred at the time of the 2006 deeds, and Joy had neither argued nor demonstrated that Alfred accepted her earlier investment in the property as past consideration. Rather, the deeds recited only nominal consideration in the amount of one dollar.[6] The Superior Court concluded that, at the time that Alfred executed the

---

[6]   Quoting this Court's observation in *Dohan v. Yearicks*, 98 A. 611 (Pa. 1916), the Superior Court explained:

(continued…)

2006 Deeds, he "simply attempted to make a gift of an undivided one-half interest [in] the property to Joy." *Id.* at 13. The court held that, as merely the intended recipient of a gift, and not a *bona fide* purchaser, Joy was not protected under the recording statutes, and could not establish superior title to the farm.

Finally, the Superior Court addressed Timothy's arguments regarding *res judicata* and collateral estoppel. Timothy contended that, under both theories, Joy's claim that Alfred had revoked his will was precluded because the Orphans' Court previously had resolved that issue when it entered its August 27, 2013 order admitting the photocopy of Alfred's will to probate. The Superior Court agreed.

First considering the doctrine of *res judicata*, the Superior Court noted that the doctrine bars litigation of "claims that were or could have been raised in a prior action which resulted in a final judgment on the merits, so long as the claims derive from the same cause of action." *Id.* at 14 (citing *Balent v. City of Wilkes-Barre*, 669 A.2d 309, 315 (Pa. 1955)). The Superior Court reasoned that the earlier action was Timothy's petition to admit the photocopy of Alfred's will to probate, which necessarily placed the validity of Alfred's will at issue. That action resulted in the Orphans' Court's August 27,

---

(…continued)

> The expression of a nominal consideration in a deed is resorted to by conveyancers to avoid the inconvenience of setting forth the real consideration when that is difficult to set forth briefly, or of a private nature, and to comply with a usage that arose because a deed of bargain and sale, under the statute of uses, originally operated merely to create a resulting trust for the grantor, unless supported by a valuable consideration, which, it was formerly held, must be a pecuniary one. It is well known that the nominal consideration of one dollar is regarded by all as having served its purpose by its mere mention in the instrument and that it almost never changes hands[.]

*Plance*, 1379 WDA 2014, slip op. at 13 n.3 (alteration in original) (quoting *Dohan*, 98 A. at 611).

2013 order, which found that Alfred had not "destroyed the original [will] with the intention of revocation." *Id.* at 15-16 (alteration in original) (quoting Order, 8/27/2013). The Superior Court noted that Joy did not appeal that order, "and, thus, it became a final order." *Id.* at 16. The court concluded that Joy's claim met the four requirements of *res judicata*: "(1) an identity in the thing sued upon[;] (2) identity in the cause of action[;] (3) identity of persons and parties to the action[;] and (4) identity of the capacity of the parties suing or sued." *Id.* at 14 (citing *In re Jones & Laughlin Steel Corp.*, 477 A.2d 527, 530-31 (Pa. Super. 1984)); *see also Daley v. A.W. Chesterton, Inc.*, 37 A.3d 1175, 1189–90 (Pa. 2012). Because the claim revisited the issue of whether Alfred revoked his will, the thing sued upon and the cause of action were the same. The parties were the same, as were their capacities. The Superior Court observed that Joy had opportunities to raise the revocation issue, but failed to do so. Thus, the court held that "there was a final judgment entered on the merits by a court of competent jurisdiction and Joy was barred by the doctrine of *res judicata* from relitigating the same cause of action in a subsequent suit." *Id.* at 16.

Although it concluded that the Orphans' Court erred based upon *res judicata*, the Superior Court proceeded to address Timothy's claim regarding collateral estoppel. The court related that the doctrine of collateral estoppel precludes the litigation of an issue where:

> (1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding[;] and (5) the determination in the prior proceeding was essential to the judgment.

*Id.* at 17 (quoting *Radakovich v. Radakovich*, 846 A.2d 709, 715 (Pa. Super. 2004)); *see also Taylor v. Extendicare Health Facilities, Inc.*, 147 A.3d 490, 511 n.30 (Pa. 2016) *cert. denied*, 137 S.Ct. 1375 (2017). Relying upon its previous discussion of *res judicata*, the Superior Court similarly concluded that the issue of the validity of Alfred's will was before the Orphans' Court in both actions, that the parties were identical, that each had a full and fair opportunity to litigate the issue, and that the earlier action resulted in a final judgment on the merits, which was essential to the judgment reflected in the Orphans' Court's August 27, 2013 order. Accordingly, the Superior Court concluded that Joy's assertion that Alfred revoked his will also was barred under the doctrine of collateral estoppel, and that the Orphans' Court "erred in revisiting the issue." *Id.*

Having ruled in favor of Timothy in all respects, the Superior Court reversed the decree of the Orphans' Court and remanded the case to that court. Joy filed a petition for allowance of appeal with this Court, which we granted in order to review the Superior Court's determinations regarding the rightful ownership of the farm *vis-à-vis* the effectiveness of the 2004 Deeds and Joy's status under the recording statutes, as well as the Superior Court's application of the doctrines of *res judicata* and collateral estoppel.[7]

---

[7] We granted allowance of appeal on the following issues, which we rephrased for clarity:

> (1) When a property owner purports to transfer land to a trust, names himself as trustee, and retains possession of the deed, what is required to deliver the deed and effectuate the conveyance to the trust, and what party bears the burden of proving that the deed was executed and delivered?

> (2) If a property owner effectively conveys land to trust for which he also serves as trustee, and he does not record the deed and retains possession of it, how does the recording statute apply to the property

(continued…)

## II.    Analysis

Preliminarily, we set forth our well-settled standard of review.  "In reviewing the decision of the orphans' court, this Court's responsibility is to assure that the record is free from legal error and to determine if the orphans' court's findings are supported by competent and adequate evidence."  *In re Klein's Estate*, 378 A.2d 1182, 1187 (Pa. 1977).  "In determining whether the findings of the orphans' court are supported by competent evidence, we must take as true all the evidence supporting the findings and all reasonable inferences therefrom."  *In re William L.*, 383 A.2d 1228, 1237 n.12 (Pa. 1978).  "Further, all conflicts in testimony must be resolved by the hearing judge, who is the sole arbitrator of credibility."  *In re C. A. W.*, 409 A.2d 16, 18 (Pa. 1979).  "Findings of the orphans' court supported by evidence of record are entitled to the same weight given a jury verdict and must be sustained unless the court abused its discretion or committed an error of law." *William L.*, 383 A.2d at 1237.

### A.  Delivery of the 2004 Deeds

Before discussing and analyzing the parties' arguments, it is helpful to summarize the general precepts of law relating to the "delivery" of deeds.  Delivery of a deed is "necessary to render it legally operative."  *Stiegelmann*, 41 A.2d at 681.  "The

---

(…continued)

> owner's subsequent conveyance of the land, in his individual capacity, to himself and his spouse as tenants by the entireties, when the latter deed is duly recorded and the spouse had no notice of the prior conveyance to the trust, but paid only nominal consideration?

> (3) When the Orphans' Court grants a petition to probate a photocopy of a will, and an opposing party did not respond to the petition or appeal the Orphans' Court's order, but raises a claim regarding the will's revocation as new matter in a responsive pleading during the estate's administration, is the claim barred by the doctrine of *res judicata* or collateral estoppel?

*In re Estate of Plance*, 144 A.3d 92 (Pa. 2016) (*per curiam*).

general principle of law is that the formal act of signing, sealing, and delivering is the consummation of the deed . . . ." *In re Cragin's Estate*, 117 A. 445, 446 (Pa. 1922). Delivery of a deed turns upon the grantor's intent to convey title to the grantee. Such delivery may be found where the grantor's words or actions reflect that essential intent. *Stiegelmann*, 41 A.2d at 681 ("Delivery is to be inferred from the words and acts of a grantor evidencing an intention on his part to surrender his title to the property (embraced by his conveyance) and to invest his grantee therewith. Such an intent, accompanied by actions or words sufficient to effectuate it, spells delivery."); *Chambley v. Rumbaugh*, 5 A.2d 171, 172 (Pa. 1939) ("Whether there was a delivery in fact in any given case depends upon the intention of the grantor as shown by his words and actions and by the circumstances surrounding the transaction, and constitutes a question to be determined from all the evidence by the [fact-finder]."); *Lewis v. Merryman*, 114 A. 655, 655 (Pa. 1921) ("Delivery is a matter of intention to pass title. It may be accomplished by words alone, by acts, or by words and acts. To be sufficient in law it must be found [that the] grantor has parted with the title."). So long as a grantor expresses the intention to convey the property, the grantor need not physically hand the deed to the grantee to complete the delivery. "While 'the crowning fact' in the execution of a deed is delivery, yet it is not necessary to prove 'actual manual investiture,' since 'delivery may be inferred or presumed from circumstances.'" *Kanawell v. Miller*, 104 A. 861, 862 (Pa. 1918) (citation omitted). "[N]o particular form or ceremony is necessary to effect delivery; it is sufficient if the grantor evidences his intention in any manner to put the document into the ownership of the other party and thereby to relinquish all control of it thereafter." *City Stores Co.*, 103 A.2d at 666.[8]

---

[8] The delivery requirement finds its origin in the ancient practice of "livery of seisin," the "ceremony by which a grantor conveyed land to a grantee." *Livery of seisin*, BLACK'S LAW DICTIONARY 1076 (10th ed. 2014). Usages date back to early English (continued…)

We have prescribed various rebuttable evidentiary presumptions in order to aid courts in determining whether the requisite intent to deliver title was present in a given case. The applicability and effect of certain presumptions is a subject of dispute between the parties in the instant case. Chief among these presumptions is the one that arises from the recording of a deed, an act that we have described as the "strongest evidence of delivery." *Lewis*, 114 A. at 655. Recording of a deed, itself, "raise[s] a presumption of delivery." *Stiegelmann*, 41 A.2d at 681 (citing *Chambley*, 5 A.2d at 172). The 2004 Deeds never having been recorded, this presumption has no application to the instant case. Joy's preferred presumption arises from a grantor's

---

(…continued)
common law. *See*, *e.g.*, THOMAS DE LITTLETON, LITTLETON'S TENURES 29, § 66 (Eugene Wambaugh ed., John Byrne & Co. 1903) (1481) ("But if a man maketh a deed of feoffment to another, and a letter of attorney to one to deliver to him seisin by force of the same deed; yet if livery of seisin be not executed in the life of him which made the deed, this availeth nothing . . . .").

> [Livery of seisin] was a ceremony consisting of a symbolic delivery of the corporeal possession of land by the grantor, or "feoffer," as he was called, to the grantee, or "feoffee." The parties, with their witnesses, went upon the land, and the feoffor gave to the feofee a stick, twig, piece of turf, or a handful of earth taken from the land. Sometimes a ring, cross, knife, or anything else, was handed over as a token of the delivery. As a further part of the ceremony, the feoffor used proper and technical words to show his intent to transfer the land to the feofee and to establish or limit the estate or interest in the land that the feoffor intended the feofee to have.

1 JOYCE D. PALOMAR, PATTON AND PALOMAR ON LAND TITLES § 3 (3d ed. 2003). As recognized by Pennsylvania law, and consistent with the modern view of conveyances, the archaic requirement of manual transfer has been replaced by an exclusive focus upon the grantor's intent. *See* 4 TIFFANY REAL PROPERTY § 1034 (3d ed. 2016) ("[T]he crude conception of a manual transfer of the instrument as the only means of making it legally effective, which gave birth to the expression 'delivery' as used in this connection, has been superseded by the more enlightened view that whether an instrument has been delivered is a question of intention merely, there being a sufficient delivery if an intention appears that it shall be legally operative, however this intention may be indicated.") (footnotes omitted).

retained possession or control of a deed: "so long as a deed is within the control of the grantor [presumptively] there is no delivery." *Piper v. Queeney*, 127 A. 474, 477 (Pa. 1925) (alteration in original) (quoting *Sears v. Scranton Trust Co.*, 77 A. 423, 429 (Pa. 1910)); *see* Brief for Joy at 15. As a corollary, this Court has applied a contrary presumption where, along with the formalities of execution, a deed is physically possessed by the grantee. *See Leiser v. Hartel*, 174 A. 106, 107 (Pa. 1934) ("It is undoubtedly correct that when a deed is acknowledged before a proper officer as being signed, sealed, and delivered, and the manual possession of the grantee is established, a presumption arises that an absolute and unconditional delivery is intended, unless by act, expression, or writing an indication is made of an intention to qualify the formal act."). Timothy, like the Superior Court, stresses a presumption of delivery arising from a grantor's acknowledgment of a deed: "the general rule [is] that there is a presumption, in the absence of proof to the contrary, that a deed was executed and delivered on the day it was acknowledged." *Herr*, 50 A.2d at 281-82; *see* Brief for Timothy at 19-20.

Independent of any presumption operating in her favor, Joy argues that, under this Court's precedent, Alfred's continued possession of the 2004 Deeds placed the burden of proof to establish delivery upon Timothy—a burden that she asserts Timothy failed to carry. Brief for Joy at 18-20. Joy analogizes the instant case to *Leahey v. Leahey*, 163 A. 677 (Pa. 1932), wherein this Court set forth the burdens of proof applicable to the delivery of an unrecorded, acknowledged deed that remains in the possession of the grantor. Due to its factual similarity to certain aspects of the instant case and its centrality to Joy's arguments in this appeal, *Leahey* warrants discussion.

In *Leahey*, the grantor was a mother of twelve children. After her death, an acknowledged but unrecorded deed, conveying several tracts of land to three of her

children, was found in her safe. More than a year after the date of that deed, however, the grantor executed five deeds conveying parts of the same land to five of her children. The grantor herself recorded the latter deeds. Following the grantor's death, the purported grantees of the earlier, unrecorded deed removed that deed from their late mother's safe and surreptitiously recorded it. Her nine other children, arguing that the earlier deed never was delivered, brought an action to cancel the deed and to strike it from the record. The trial court granted the requested relief, and the purported grantees of the earlier deed appealed to this Court.

Reviewing the controlling issue of whether the earlier deed effectively was delivered, this Court began by noting:

> A deed does not become operative until delivered with the intent that it shall become effective as a conveyance. Delivery is a matter of intent to pass title. It may be accomplished by words alone, by acts, or by words and acts. But there must be something answering to one or the other of these conditions, evidencing an intent to give it effect as a deed.

*Id.* at 679-80 (quoting *Cragin's Estate*, 117 A. at 446). The *Leahey* Court found that evidence of the grantor's intent to deliver the earlier deed was lacking. Importantly, the Court noted that the grantor's "failure to record the deed in controversy, and placing on record those [latter deeds] which conveyed part of the same property, speaks very convincingly in aid of the conclusion that she had not intended the unrecorded deed to be an effective grant." *Id.* at 678.

The *Leahey* Court declined to base its reasoning upon any presumption arising from the grantor's retained possession of the deed, or from her acknowledgment of it. The Court explained:

> While we are not prepared to go to the full length the [trial court] went in holding that the retention of the deed in [the grantor's] private safe among her other private papers raised a presumption that the deed had never been delivered, we do hold that its being found there cast the burden on

[the purported grantees] to show that it had been delivered. This burden was not met.

\* \* \*

In the case in hand, there were neither credible words nor acts to show that the deed had been delivered. The plaintiffs made out a *prima facie* case by showing the possession of the deed by the grantor. The burden was not then upon plaintiffs to show that the deed had not been delivered, but upon the grantees to show that it had been. It would be dangerous to hold in every instance, where an executed and acknowledged deed is found in the possession of the grantor, that a presumption of delivery arises from mere execution and acknowledgment. It is undoubtedly true that there are deeds in safes or other receptacles which have been executed and acknowledged but not delivered because the purchase had not been completed by the grantee. It would not do to hold that under such circumstances a presumption of delivery arises.

*Id.* at 679-80.

Joy observes that Alfred never relinquished physical possession of the unrecorded 2004 Deeds. Thus, she argues that, pursuant to *Leahey*, Timothy bore the burden to establish that Alfred delivered the 2004 Deeds. In light of the evidence adduced before the Orphans' Court, Joy asserts that Timothy failed to meet that burden. She further adds, *arguendo*, that, even if a presumption of delivery arose from Alfred's acknowledgment of the 2004 Deeds, the evidence amply rebutted that presumption. *See* Brief for Joy at 19. In addition to the evidence that the Orphans' Court relied upon—that Alfred retained possession of the 2004 Deeds but never recorded them, and that he acted in contradiction to the trusts' purported ownership by executing and recording the 2006 Deeds—Joy notes that Timothy was not aware of the trust documents until the meeting with Attorney Werner in 2012, that Alfred and Joy executed the Range Resources lease as tenants by the entireties despite the trusts' purported ownership of the farm, that the trusts did not pay for the farm's expenses or engage in its operation, and that, instead of recording the 2004 Deeds, Alfred "likely destroyed those Deeds when they were returned to him" by Attorney Werner. *Id.* at 19-20.

In response to Joy's arguments regarding the burden of proof, which rely upon the conclusion that Alfred retained possession of the 2004 Deeds as the *grantor*, Timothy argues that Joy "ignores the most salient fact in this case: the grantor and the grantee are one [and] the same." Brief for Timothy at 13 (emphasis omitted).[9] Timothy asserts that, if Joy's theory of delivery prevails, and if the grantor's continued possession of a deed is dispositive, then an individual would not be able to convey property to oneself and another, so as to create a joint tenancy or a tenancy by the entireties, without resurrection of the archaic practice of using a "straw man" to validate such conveyances. *See id.* at 15. As Timothy explains, earlier in the history of the law, where owners intended to transfer property from themselves to themselves and others as joint tenants, the ancient physical delivery requirement made it impossible to satisfy the traditional common law requirements for the creation of a joint tenancy, known as the "four unities" of interest, title, time, and possession. *Id.*[10] "Thus, the owner was required to convey the property by deed to a third party 'straw man' who would immediately re-convey it to the owner and another individual as joint tenants, meeting the four unities." *Id.* at 15-16. Timothy notes that the "straw man" requirement has

---

[9] Joy does acknowledge that Alfred was both the grantor and the grantee of the 2004 Deeds, albeit in different capacities. Joy asserts that this circumstance raises an issue of first impression before this Court. *See* Brief for Joy at 18. As discussed, *infra*, this Court previously has addressed the validity of such conveyances pursuant to the Uniform Interparty Agreement Act, 69 P.S. § 541.

[10] *See*, *e.g.*, *In re Estate of Quick*, 905 A.2d 471, 474 (Pa. 2006) (identifying the four unities as the "essence" of a joint tenancy with a right of survivorship). Like the requirement that a deed be delivered by the grantor, the four unities of a joint tenancy have a long history in the common law. *See* 2 WILLIAM BLACKSTONE, COMMENTARIES *180 ("The properties of a joint-estate are derived from its unity, which is fourfold; the unity of interest, the unity of title, the unity of time, and the unity of possession; or, in other words, joint-tenants have one and the same interest, accruing by one and the same conveyance, commencing at one and the same time, and held by one and the same undivided possession.").

been rejected in modern times in favor of a trend toward validating conveyances from an individual to himself or herself in a different capacity, without the necessity of an intervening actor to effectuate delivery. *Id.* at 16-17 (quoting *Therrien v. Therrien*, 46 A.2d 538, 539 (N.H. 1946) (describing the "straw man" practice as a "circuitous device, incomprehensible to laymen and in the twentieth century difficult of justification by the legal profession," which "has been frequently criticized and rarely praised."); *Haynes v. Barker*, 239 S.W.2d 996, 997 (Ky. 1951) (noting that allowing such conveyances by a single deed "would make effectual the interest which the parties by their conveyance intended to create, without regard to those technicalities descending from the feudal period.")).

Timothy notes that Pennsylvania law follows the modern trend and "authorize[s] conveyances by one party to himself and another as joint tenants," *id.* at 15 n.1, and that the principle was codified by the Pennsylvania General Assembly as the Uniform Interparty Agreement Act, 69 P.S. § 541. Just as an individual may convey from oneself as an individual to oneself as a joint tenant, Timothy argues that one may convey property as an individual to oneself as a trustee, without any need for a deed to physically change hands. Brief for Timothy at 17.

Timothy dismisses Joy's reliance upon *Leahey*, arguing that the case is inapposite because it dealt with a grantor and grantees who were different individuals. Here, Timothy asserts, Alfred also was the grantee, and possessed the deed in that capacity. Timothy returns to the presumption arising from acknowledgment, arguing that "[i]t should be enough that the [g]rantor, as in this case, executed and acknowledged the [2004 Deeds] as [g]rantee." *Id.* Thus, Timothy asserts, "the Superior Court correctly found that the [Orphans' Court] ignored the relevant indicia, *i.e.*, the deed was executed and acknowledged therefore delivery occurred." *Id.* at 19. He

endorses the Superior Court's conclusion that "there was no competent evidence to the contrary to rebut the presumption [of delivery]." *Id.* at 20.

Initially, and as a general matter, we agree with Timothy that an individual legally is capable of effectuating a valid conveyance as both the grantor and a grantee in a different capacity, that such an individual may complete the conveyance through a single instrument, and that no physical delivery or intervening "straw man" is necessary. Contrary to Joy's assertion, dual status as a grantor and grantee of a deed is not a novel legal concept, and conveyances of this sort have been recognized as valid for nearly a century. Enacted in 1927, the Uniform Interparty Agreement Act provides, in relevant part, that "[a] conveyance, release or sale may be made to, or by, two or more persons acting jointly, and one or more, but less than all of these persons, acting either by himself or themselves or with other persons, and a contract may be made between such parties." 69 P.S. § 541. It further provides that "[n]o contract shall be discharged because, after its formation, the obligation and the right thereunder become vested in the same person, acting in different capacities as to the right and the obligation." 69 P.S. § 542.

The Superior Court first addressed the Uniform Interparty Agreement Act in *In re Vandergrift's Estate*, 161 A. 898 (Pa. Super. 1932), and held that a grantor could use a single deed to transfer property from herself to herself and her husband as tenants by the entireties. The Superior Court explained:

> The court below held that she could not do so, because she could not convey directly to herself. It seems that this was the rule under the common-law theory of grants or transfers of an interest in land, which required distinct and separate grantors and grantees. . . . The opinion of the court below makes no reference to [the Uniform Interparty Agreement Act]. To us it seems clear that one of the manifest purposes of the statute was to enable one person to make a conveyance of his land to another person jointly with himself and in that manner to divest himself of his entire estate therein.

*Id.* at 900. This Court cited *Vandergrift's Estate* with approval in *Lafayette v. Brinham*, 69 A.2d 130 (Pa. 1949), and held that a grantor could create a joint tenancy with himself and another through a single deed, and that, under the Uniform Interparty Agreement Act, no "straw man" was necessary to validate the conveyance. *See id.* at 132 ("The four unities were present: the parties took a fee (unity of interest); the estate of both *was created by a single deed* (unity of title); their interests vested at the same time (unity of time); [and] each was entitled to possession of the whole (unity of possession).") (emphasis added; footnote omitted).

Just as one may grant property to oneself as a joint tenant or tenant by the entireties, one may use a single deed to transfer property to oneself as a trustee. However, this uncontroversial observation does nothing to resolve the instant question regarding the effectiveness of delivery. The complication is that, where an individual is both the grantor and grantee of the same deed, the opposing presumptions relating to possession and control of a deed serve to defeat one another. Here, Alfred was the grantor, and he retained possession of the 2004 Deeds. Therefore, presumptively, there was no delivery. *See Piper*, 127 A. at 477. However, Alfred also was the grantee, and his possession of the deeds in that capacity gives rise to a presumption of delivery. *See Leiser*, 174 A. at 107. For this reason, the Superior Court was correct in concluding that "indicia of delivery such as 'relinquishment of control' . . . are not relevant" to the analysis. *Plance*, 1379 WDA 2014, slip op. at 10. Where the same individual is both a deed's grantor and its sole grantee, no justifiable inference regarding the effectiveness of delivery may be drawn merely from that individual's continuous possession and control of the deed.

Because any presumption relating to control of the 2004 Deeds is offset by its counterpart, and because the 2004 Deeds never were recorded, the only presumption

potentially bearing upon the question of delivery is that arising from acknowledgment—that "a deed was executed and delivered on the day it was acknowledged." *Herr*, 50 A.2d at 282. Due to the same concerns identified in *Leahey*, however, we approach this presumption with circumspection as it applies to the circumstances of the instant case. As noted, above, the *Leahey* Court cautioned that it would be "dangerous" to presume that an executed and acknowledged deed remaining in the possession of the grantor has been delivered, because "[i]t is undoubtedly true that there are deeds in safes or other receptacles which have been executed and acknowledged but not delivered because the purchase had not been completed by the grantee. It would not do to hold that under such circumstances a presumption of delivery arises." *Leahey*, 163 A. at 680. In other words, it is entirely plausible that a deed may be prepared and acknowledged, but the conveyance not consummated because the grantor has not yet intended to make it effective, that intent—accompanied by words or actions sufficient to express it—being necessary to constitute delivery.

Turning to the burden of proof, we agree with Timothy that *Leahey*'s burden-shifting approach was premised upon the fact that the unrecorded deed at issue was found in the possession of the grantor. *See id.* at 679-80. Like the rebuttable presumptions relating to the possession and control of a deed, Alfred's dual status as the grantor and the grantee of the 2004 Deeds removes much of the logical force from the *Leahey* Court's assignment of the burden of proof. Here, the burden to prove that the 2004 Deeds never were delivered conforms to a more general proposition. "Ordinarily, those who claim non-delivery of a deed bear the burden of so proving, in the absence of fraud, weakened intellect or a confidential relationship." *Sci. Living, Inc. v. Hohensee*, 270 A.2d 216, 221 (Pa. 1970). Joy challenged the validity of the 2004

Deeds, and she alleged that they were not delivered. Accordingly, Joy bore the burden to prove that assertion.

As the evidence adduced before the Orphans' Court revealed, Joy amply met her burden. Even if a presumption of delivery arose from Alfred's acknowledgment of the 2004 Deeds, the evidence was sufficient to rebut that presumption. We reiterate that our standard of review requires us to accept as true all of the evidence supporting the Orphans' Court's findings and all reasonable inferences therefrom, to afford those findings the same weight as a jury verdict, and to sustain the decree of the Orphans' Court absent an abuse of discretion or error of law. *See William L.*, 383 A.2d at 1237 & n.12. The Orphans' Court found as follows:

> The facts in this case do not support a finding that there was an effective delivery of the [2004] Deeds that would have transferred the Plance farm into the trusts that were executed in August of 2004. The facts are that Attorney Bolind did not follow his usual practice and he did not record the deeds. [Alfred] himself, although in possession of the Deeds from August 2004 until at least August 2012, did not record the deeds. Attorney Werner did not record the deeds in May 2012 and again, [Alfred] did not follow Attorney Werner's advice to record the deeds to fund the trusts. . . . Not only did [Alfred] not record the documents that were in his possession, but he also acted in direct contradiction to the trusts' supposed ownership of the land by later transferring it to himself and [Joy].

Orph. Ct. Mem. Op., 7/22/2014, at 8-9 (some capitalization and punctuation modified, emphasis omitted). The Orphans' Court's findings were supported by the testimony, and the court correctly viewed the issue of delivery as a question of Alfred's intent, concluding that the facts demonstrated that Alfred "never intended to transfer the Plance farm" into the trusts. *Id.* at 9.

In light of these findings, the Superior Court's conclusion that "Joy presented no evidence to rebut the presumption" of delivery, *Plance*, 1379 WDA 2014, slip op. at 10, was erroneous. We note that Joy highlights other evidence in the record which

indicates that Alfred never intended to convey title to the farm to the trusts, and which further supports the Orphans' Court's findings. For instance, Timothy testified that he was not aware of the trusts or the 2004 Deeds until the 2012 meeting with Attorney Werner, that he had not seen the documents until that time, and that Alfred never told him of the trusts or that he was a beneficiary. *See* N.T., 5/19/2014, at 92-93. Joy observes that there was no evidence of the trusts' operation, such as invoices or expenses paid by the trusts for the farm. *See, e.g.*, *id.* at 44, 139. Significantly, Joy notes that, by executing the Range Resources lease and receiving payment with Joy as a tenant by the entireties, Alfred expressed his belief that he and Joy were the owners of the farm, and that title to the farm never transferred to the trusts. By contrast, beyond Alfred's acknowledgment of the 2004 Deeds, Timothy points to no evidence suggesting Alfred's intent to convey title to the farm into the trusts.

Although we agree with the Superior Court that Alfred's failure to record the 2004 Deeds was not dispositive of whether they effectuated a valid conveyance, we also agree with the Orphans' Court that, especially in conjunction with Alfred's subsequent actions, and coupled with his numerous opportunities and his defiance of the advice of counsel, his failure to record those deeds suggests that Alfred lacked the necessary intent to convey the farm to the trusts, so as to constitute an effective delivery. As the *Leahey* Court noted, the failure to record the deeds in controversy, considered alongside the act of recording the latter deeds conveying the same property, "speaks very convincingly in aid of the conclusion" that Alfred "had not intended the unrecorded deed[s] to be an effective grant." *Leahey*, 163 A. at 678. While by no means conclusive in every circumstance, such actions are highly suggestive of the grantor's intent.

It may seem counterintuitive to analyze the effectiveness of a conveyance based largely upon actions taken subsequent to the drafting and acknowledgment of a deed.

Nevertheless, whether a deed was delivered is a question of the grantor's intent, and the nature of that inquiry requires evaluation of all of the facts and circumstances that bear upon the presence of that intent. Surely, if the parties to a deed desire that a conveyance be unequivocal, and wish to minimize the possibility that a court later will be required to parse evidence of the grantor's intent, then the best practice is to ensure prompt recording of the deed. In the absence of recordation, the putative grantor's subsequent conduct can be competent—and sometimes highly persuasive—evidence of whether he intended the challenged conveyance to be effective.

Here, the Orphans' Court's decision was supported by competent evidence, the court applied the correct principles of law in evaluating the question of delivery, and the court did not abuse its discretion in determining that Joy possesses superior title to the farm by virtue of the 2006 Deeds. In reversing the Orphans' Court's decision on that issue, the Superior Court erred. Accordingly, we reverse the order of the Superior Court in that regard.

### B. Effect of the Recording Statutes

Because we conclude that the Orphans' Court did not err in determining that the 2004 Deeds were not delivered, and that Joy possesses superior title to the farm as a surviving tenant by the entireties pursuant to the 2006 Deeds, we need not address Joy's arguments regarding her status under the recording statutes. Regardless of whether Joy was a *bona fide* purchaser of the farm for purposes of the recording statutes, the interest that Joy acquired through the 2006 Deeds is not in competition with any unrecorded interest *vis-à-vis* the 2004 Deeds. In light of our previous discussion, this issue is moot, and we turn to the final issue presented in this appeal.

## C. Joy's Challenge to Alfred's Will

Independent of our analysis of rightful title to the farm, we also granted review of the question that Joy raised regarding the Superior Court's conclusion that, pursuant to the doctrines of *res judicata* and collateral estoppel, she was precluded from advancing her claim that Alfred revoked his will and, therefore, died intestate.

As Joy frames the issue, the Orphans' Court properly reconsidered and corrected its August 27, 2013 order admitting the photocopy of Alfred's will to probate, because the court recognized that Timothy had failed to rebut an applicable and dispositive presumption: that, where an original will remains in the possession of the testator and cannot be located after the testator's death, a court is to presume that the testator revoked or destroyed the will, absent positive, clear, and satisfactory evidence to the contrary. *See* Brief for Joy at 25-26 (citing *In re Wasco's Estate*, 281 A.2d 877, 879 (Pa. 1971)). Joy first challenged the admission of the photocopy to probate in a responsive pleading during the estate's administration, after the Orphans' Court had determined that the photocopy was valid and that Alfred had not destroyed his original will with the intention of revocation, and after Timothy had been granted Letters Testamentary. Nonetheless, Joy asserts that neither *res judicata* nor collateral estoppel precluded her challenge because both of those doctrines require, as an essential prerequisite, a prior action that resulted in a final order.

Here, Joy argues, "there was no prior lawsuit or prior action." *Id.* at 27. Rather, Joy argues that she advanced her challenge within the context of the estate administration proceedings, the same proceedings in which the Orphans' Court entered its initial order admitting the photocopy to probate. Joy further stresses the Orphans' Court's determination that neither *res judicata* nor collateral estoppel may apply because the court merely granted Timothy's probate petition as a preliminary matter

during motions court, because there was no hearing convened and no evidence offered, and because Joy, therefore, did not have an opportunity to litigate her claim. *Id.* (quoting Orph. Ct. Mem. Op., 7/22/2014, at 1; Orph. Ct. Op., 10/28/2014, at 2). Joy asserts that "it is clear that the August 27, 2013 order was not produced as a result of a hearing, and would not [be] considered a prior action, but an order entered in the same action." *Id.* (capitalization modified). Accordingly, because there was "no prior action resulting in a final judgment on the merits," *id.* at 29, and because *res judicata* and collateral estoppel cannot "be applied within the same proceeding," *id.*, Joy argues that the Superior Court erred in holding that she was precluded from challenging the validity of the photocopy of Alfred's will.

Though he cites no authority beyond the Superior Court's memorandum in the instant case, Timothy counters that "the proceeding to determine whether to allow a photocopy of a will to be probated is a separate proceeding from the proceedings involved in the administration of the estate." Brief for Timothy at 26-27. The Superior Court correctly applied *res judicata*, Timothy argues, because Timothy filed his petition to probate the photocopy, Joy filed no responsive pleading at that time, Joy was represented by counsel and appeared in court to contest Timothy's petition, the Orphans' Court granted Timothy's petition and entered its August 27, 2013 order (necessarily determining that the photocopy of the will was valid), and Joy did not appeal that order, rendering it final for purposes of *res judicata*. *Id.* at 28. Timothy would have this Court conclude that, when Joy raised her challenge to the validity of the photocopy as new matter in a responsive pleading, she initiated a new action that was precluded by *res judicata*. Timothy offers no argument on the separate elements of collateral estoppel, instead arguing that the Superior Court correctly applied that doctrine for the same reasons that it applied *res judicata*. *See id.* at 29.

Before resolving the parties' differing contentions regarding the applicability of the preclusion doctrines, we note that there is an initial, threshold matter that has not been addressed by the parties or the lower courts, and which bears upon both the viability of Joy's challenge and the determination of whether the Orphans' Court's August 27, 2013 order was "final" for purposes of *res judicata* or collateral estoppel.

Appeals from orders of our Orphans' Court divisions are governed by Rule 342 of the Pennsylvania Rules of Appellate Procedure, which provides, in relevant part:

Rule 342.  Appealable Orphans' Court Orders

**(a) General rule.**  An appeal may be taken as of right from the following orders of the Orphans' Court Division:

\*        \*        \*

(2) An order determining the validity of a will or trust;

\*        \*        \*

**(c) Waiver of objections.**  Failure to appeal an order that is immediately appealable under paragraphs (a)(1)-(7) of this rule shall constitute a waiver of all objections to such order and such objections may not be raised in any subsequent appeal.

Pa.R.A.P. 342.

Rule 342 was amended in 2011 to include the above-cited language, and this Court has not addressed the rule since that revision.  Prior to the most recent revision, the rule "[did] not require that any particular class of orders be treated as final, but instead [left] the determination of finality of orders not disposing of all claims and all parties up to the Orphans' Court judge."  *In re Estate of Stricker*, 977 A.2d 1115, 1118 (Pa. 2009).  Concurring in *Stricker*, then-Justice, now Chief Justice, Saylor questioned the prudence of this rule, as the case-by-case determination of finality procedure could lead to inconsistent results in different Orphans' Courts, and could cause undue delays

in estate administration. Justice Saylor opined that "allowing appeals as of right most frequently would result in a net benefit." *Id.* at 1121 (Saylor, J., concurring). Following Justice Saylor's recommendation in *Stricker*, Rule 342 was revised to provide for appeals as of right for specified categories of Orphans' Court orders. *See* Pa.R.A.P. 342(a). The rule explicitly states that objections to such orders must be raised in an immediate, timely appeal, on pain of waiver. *See* Pa.R.A.P. 342(c).

In the instant case, the Orphans' Court's August 27, 2013 order, which admitted the photocopy of Alfred's will to probate, specifically included a determination that the will "has been lost and misplaced and that the testator has not destroyed the original with the intention of revocation." Order, 8/27/2013. On its face, this was an "order determining the validity of a will or trust." Pa.R.A.P. 342(a)(2).[11] As such, the order was immediately appealable. Joy did not pursue an appeal from that order, and did not first assert that Alfred had revoked his will until she raised the claim in new matter in her pleading dated December 12, 2013. At that time, and independent of *res judicata* or collateral estoppel, Timothy would have been entitled to seek enforcement of the waiver provision of Rule 342(c) and to prevail upon the basis that Joy's failure to appeal the August 27, 2013 order constituted "a waiver of all objections" to that order—objections which "may not be raised in any subsequent appeal." Pa.R.A.P. 342(c).

---

[11] We recognize that the Orphans' Court did not intend the entry of its order on August 27, 2013 to prejudice Joy's ability to challenge the will at a later time. In determining that Alfred's will remained valid and admitting the photocopy to probate, but apparently indicating to the parties in open court "that the will itself could still be challenged or contested," Orph. Ct. Op., 10/28/2014, at 2, the Orphans' Court appears to have concluded that its August 27, 2013 order was not "final." While this may have been viable under the "determination of finality" procedure prescribed by the previous version of the rule, such was not the practice following the 2011 revisions to Rule 342, which rendered such an order immediately appealable as of right, without regard to the "finality" of the order or the Orphans' Court's determination thereof.

However, Timothy never has asserted an objection based upon Rule 342(c). In fact, before this Court, neither Joy nor Timothy has advanced any argument regarding Rule 342. Neither the Orphans' Court nor the Superior Court addressed the rule, and it is cited in none of the parties' pleadings. The only mention of Rule 342 throughout this case appears in Timothy's Reply Brief to the Superior Court, in which Timothy noted that Joy could have appealed the August 27, 2013 order, but did not do so. *See* Superior Court Reply Brief of Timothy at 11-12. However, that citation was not accompanied by any discussion of the waiver provision of Rule 342(c).

In the absence of the parties' recognition of and advocacy regarding the effect of the applicable appellate rule, this Court will not *sua sponte* advance a waiver objection on Timothy's behalf. Rather, we conclude that the instant case falls within the class of circumstances in which this Court will undertake merits review of issues that may have been deemed to be waived, because an opposing party failed to advance a waiver contention before the appropriate court, thereby preserving the issue for appellate review. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Williams*, 141 A.3d 440, 464 n.23 (Pa. 2016) (concluding that the Commonwealth's wavier argument itself was waived pursuant to Rule 302(a), where it was not raised in the lower court, but advanced for the first time on appeal); *Commonwealth v. Sanchez*, 82 A.3d 943, 972 n.10 (Pa. 2013) (noting that the Commonwealth had not pursued a waiver contention, and proceeding to the merits of issues because the Commonwealth had "waived the waiver" with regard to those issues). Accordingly, beyond noting for future courts and litigants that the dictates of Rule 342 control the procedures applicable to appeals from orders of the Orphans' Court such as the one at issue, as well as the viability of subsequent challenges to those orders, we will not dispose of the issue at bar upon the

basis of Rule 342(c)'s waiver provision.  Rather, because Timothy has waived any potential waiver argument, we proceed to the merits of the parties' contentions.

Although the doctrines involve distinct considerations, *res judicata* and collateral estoppel both serve to preclude a party from pursuing litigation that revisits a claim or an issue that has been settled by a previous action, thereby preserving the interest in finality of judicial determinations, preventing endless litigation, and precluding parties from obtaining the proverbial "second bite at the apple."  Relating to the preclusion of a *claim*, "[t]he doctrine of *res judicata* will preclude an action where the former and latter suits possess the following common elements:  (1) identity of issues; (2) identity in the cause of action; (3) identity of persons and parties to the action; and (4) identity of the capacity of the parties suing or being sued."  *Daley v. A.W. Chesterton, Inc.*, 37 A.3d 1175, 1189-90 (Pa. 2012).  The related but distinct doctrine of collateral estoppel precludes the subsequent litigation of an *issue* where:

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

*Taylor v. Extendicare Health Facilities, Inc.*, 147 A.3d 490, 511 n.30 (Pa. 2016), *cert. denied*, 137 S.Ct. 1375 (2017) (quoting *Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50-51 (Pa. 2005)).

Critically, neither *res judicata* nor collateral estoppel will preclude subsequent litigation if the prior action or ruling in question did not result in a final judgment.  "It is axiomatic that in order for either collateral estoppel or *res judicata* to apply, the issue or issues must have been actually litigated and determined by a valid and final judgment."

*Cty. of Berks ex rel. Baldwin v. Pa. Labor Relations Bd.*, 678 A.2d 355, 359 (Pa. 1996). Thus, as Joy correctly observes, to conclude that Joy's challenge to the Orphans' Court's August 27, 2013 order was precluded by either doctrine, we necessarily would be required to determine that the order at issue was, in fact, "final" for purposes of *res judicata* or collateral estoppel.

To analyze the preclusive effect of the August 27, 2013 order, we return to Rule 342. Notably, although Rule 342 renders an order that falls within its ambit appealable "as of right," Pa.R.A.P. 342(a), the text of the rule does not speak to the "finality" of such an order. Preliminarily, by the very existence of Rule 342, and its recognition that orders of the Orphans' Court divisions require a unique set of appellate procedures, it is apparent that the rule conceptually is distinct from the immediately preceding rule—Rule 341—which sets forth the general parameters of a final order, from which an appeal may be taken as of right. *See* Pa.R.A.P. 341(b) (defining a final order as one that "disposes of all claims and of all parties" or "is entered as a final order" pursuant to a court's determination of finality for purposes of appeal). By virtue of the longstanding recognition that litigation in Orphans' Court involves considerations not directly comparable to those to which Rule 341 apply, and of the corresponding need for a separate appellate rule applicable to those divisions, it is clear that the resolution of the finality question in the instant case is not controlled by Rule 341's generally-applicable definition of a final order.

Further, no insight may be gained from the fact that Rule 342 renders the subject orders appealable "as of right." Although "an appeal may be taken as of right from any final order," Pa.R.A.P. 341(a), there are, indisputably, certain species of judicial orders that are appealable "as of right" that, nonetheless, do not constitute final orders. For example, interlocutory appeals may be taken "as of right" under circumstances set forth

in Rule 311. *See* Pa.R.A.P. 311(a) (enumerating orders from which an "appeal may be taken as of right and without reference to Pa.R.A.P. 341(c) . . ."). Although such interlocutory orders are appealable as of right in the same manner as an order under Rule 342(a), an interlocutory order, by definition, is not "final."[12] Accordingly, the finality of an Orphans' Court order is not determined necessarily or inexorably by the text of Rule 342(a).

Moreover, although Rule 342 was revised in 2011 to alter the previously-applicable procedure, it is significant that the earlier version of the rule did not "require that any particular class of orders be treated as final," instead leaving "the determination of finality of orders not disposing of all claims and all parties up to the Orphans' Court judge." *Stricker*, 977 A.2d at 1118. While the determination of finality procedure since has been rejected as unworkable, it is suggestive that our appellate rules never have considered an Orphans' Court order such as the one at issue to be final *per se.* The explanatory note to Rule 342 provides further insight into the reasons for the revisions and the relationship between Orphans' Court orders and final orders as traditionally understood:

> Since 2005, it has become apparent that other adversarial disputes arise during the administration of an estate, trust or guardianship, and that orders adjudicating these disputes also must be resolved with finality so that the ordinary and routine administration of the estate, trust or guardianship can continue. *See Stricker*, 977 A.2d at 1120 (Saylor, J., concurring). Experience has proven that the determination of finality procedure . . . is not workable and has been applied inconsistently around the Commonwealth. *See id.* (citing *Commonwealth v. Castillo*, 888 A.2d 775, 779 (Pa. 2005) (rejecting the exercise of discretion in permitting appeals to proceed)).

---

[12] *See interlocutory*, BLACK'S LAW DICTIONARY 938 (10th ed. 2014) ("(Of an order, judgment, appeal, etc.) interim or temporary; not constituting a final resolution of the whole controversy.")

Experience has also proven that it is difficult to analogize civil litigation to litigation arising in estate, trust and guardianship administration. The civil proceeding defines the scope of the dispute, but the administration of a trust or estate does not define the scope of the litigation in Orphans' Court. Administration of a trust or an estate continues over a period of time. Litigation in Orphans' Court may arise at some point during the administration, and when it does arise, the dispute needs to be determined promptly and with finality so that the guardianship or the estate or trust administration can then continue properly and orderly. Thus, the traditional notions of finality that are applicable in the context of ongoing civil adversarial proceedings do not correspond to litigation in Orphans' Court.

In order to facilitate orderly administration of estates, trusts and guardianships, the 2011 amendments list certain orders that will be immediately appealable without any requirement that the Orphans' Court make a determination of finality.

Pa.R.A.P. 342, Note (citations modified).[13]

In light of these considerations, and bearing in mind "that it is difficult to analogize civil litigation to litigation arising in estate, trust and guardianship administration," and that "the traditional notions of finality that are applicable in the context of ongoing civil adversarial proceedings do not correspond to litigation in Orphans' Court," *id.*, we conclude that Rule 342 does not mandate that the Orphans' Court's August 27, 2013 order be treated as "final" for purposes of *res judicata* and collateral estoppel. Rather, the order admitting the photocopy of Alfred's will to probate was the initiation of the estate administration proceedings. When Timothy sought relief from Joy's alleged dissipation of estate assets, in response to which Joy raised the challenge at issue, he did so within the context of those same estate administration proceedings. To conclude

---

[13] As we explained in *Laudenberger v. Port Auth. of Allegheny Cty.*, 436 A.2d 147 (Pa. 1981), such "explanatory notes have not been officially adopted or promulgated by this Court, nor do they constitute part of the rule. However, they indicate the spirit and motivation behind the drafting of the rule, and they serve as guidelines for understanding the purpose for which the rule was drafted." *Id.* at 151.

to the contrary, and to hold that the August 27, 2013 order marked the conclusion of one proceeding, with the subsequent pleadings representing the initiation of new, entirely separate proceedings, would be a failure to recognize the fluid and essential nature of estate administration. Because we instead conclude that Joy's challenge to the August 27, 2013 order did not arise within the context of subsequent litigation following a "final order," but, rather, was advanced within the same proceedings as the challenged order, Joy is correct that neither *res judicata* nor collateral estoppel served to preclude her claim. In this regard as well, we reverse the order of the Superior Court.

**III.    Conclusion**

For the foregoing reasons, the order of the Superior Court is reversed, and the matter is remanded for further proceedings consistent with this Opinion.


Chief Justice Saylor and Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Dougherty files a concurring opinion.